IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 15, 2015

**IN RE JAYLAH W., ET AL.**

**Appeal from the Juvenile Court for Chester County**
**No. 2015JV1290     Larry McKenzie, Judge**

_____

**No. W2015-00993-COA-R3-PT – Filed October 7, 2015**
_____

In this termination of parental rights case, Mother appeals the trial court's findings of the following grounds for termination: abandonment for failure to provide a suitable home; abandonment by an incarcerated parent; abandonment by willful failure to visit; abandonment by willful failure to support; substantial noncompliance with the permanency plans; and the persistence of conditions. Mother also appeals the trial court's conclusion that termination was in the children's best interest. We reverse as to the trial court's findings of abandonment by failure to provide a suitable home and abandonment by an incarcerated parent. We vacate the trial court's findings of abandonment by willful failure to support and substantial noncompliance with the permanency plans due to the trial court's failure to make specific findings of fact. We affirm the trial court's findings of abandonment by willful failure to visit and persistence of conditions. We also affirm the trial court's finding that termination is in the best interest of the children. Accordingly, we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; Vacated in Part; Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Carl E. Seely, Jackson, Tennessee, for the appellant, Tameisha W.

Herbert H. Slatery, III, Attorney General and Reporter; and Rebekah A. Baker, Senior Counsel, for the  appellee, Tennessee Department of Children's Services.

Lanis L. Karnes, Jackson, Tennessee, Guardian ad Litem.

# OPINION

## I. Background

This case involves the termination of the parental rights of Tameisha W.[1] ("Mother") to two of her children, Ja'Sontay W. (born December 2008) and Jaylah W. (born November 2005).[2] The Department of Children's Services ("DCS") first became involved with Mother and her older children in 2004 upon referrals that Mother was abusing cocaine. Mother's two oldest children, who are not at issue in this case, were removed from her care due to her cocaine abuse. In 2005, Jaylah was first removed from Mother's care immediately after her birth because of allegations that Mother was abusing cocaine during her pregnancy with Jaylah. DCS did not file a petition to terminate Mother's parental rights at this point. Eventually, after Mother had made some positive changes, the children were returned to her in 2010.[3]

In October 2011, however, both of the children at issue were again removed from Mother's care due to safety concerns. Specifically, DCS received a referral that Mother was residing with her boyfriend at the time, who was a convicted and registered sex offender. Furthermore, the boyfriend had allegedly sexually abused Jaylah, and Mother previously entered an agreement with DCS agreeing to not allow the boyfriend around the children.

On June 5, 2012, the children were adjudicated dependent and neglected, based upon the previously adjudicated grounds that Mother was residing with a sex offender and tested positive for cocaine. Legal custody of Jaylah and Ja'Sontay was awarded to Dorothy T., their maternal great aunt. Legal custody of Mother's other children was given to other relatives. On April 18, 2013, however, because of environmental and abandonment issues, the relative placements ended. No other relative was available to take care of the children, including Jaylah and Ja'Sontay. Accordingly, on April 18, Jaylah and Ja'Sontay were placed in a foster home with Emma ("Foster Mother") and Curtis W. ("Foster Father," together with Foster

---

[1] In cases involving minor children, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Mother has three other children that are not at issue in this case. Also, the children in this case have different fathers. No father has come forward for Jaylah. Ja'Sontay's father's rights were terminated by the trial court, and he did not appeal. Thus, Mother is the sole appellant.

[3] The record is unclear as to whether Ja'Sontay resided with Mother during any or all of the first two years of his life.

Mother, "Foster Parents").[4] Additionally, on April 18, 2013, the trial court entered a "Restraining Order and No Contact Order," which provided that Mother and certain other relatives of the children (namely their previous placements) were not permitted to have contact with the children.

Shortly thereafter, on May 2, 2013, the first permanency plan in this case was developed. This plan included two goals: (1) return to parent or (2) "exit custody with relative." The plan provided that Mother would fulfill the following tasks: (1) notify DCS of any address or telephone number changes; (2) maintain contact with the assigned DCS caseworker; (3) visit with the children for a minimum of four hours per month once the No Contact Order was lifted and develop a positive bond with the children; (4) participate in parenting classes; (5) participate in an updated mental health assessment and follow the recommendations given; (6) participate in a parenting/psychological assessment, if permitted by DCS; (7) obtain and maintain suitable housing; (8) avoid incurring new criminal charges and resolve pending charges; (9) cooperate with probation officers; (10) legally earn income through employment or other means; (11) submit to random drug screens, and if any return positive for illegal drugs, complete an alcohol and drug assessment and follow recommendations; and (12) participate in all mental health appointments as needed once the No Contact Order is lifted. At the same time the first permanency plan was entered into, Mother submitted to a urine drug screen and tested positive for cocaine. The first permanency plan was eventually ratified by the trial court on October 3, 2013.

On June 6, 2013, the trial court entered another "Order Granting the No-Contact/Restraining Order." In this order, the trial court prohibited certain relatives and Mother from having contact with the children until further order of the court. The trial court provided that custody of Jaylah and Ja'Sontay would again be with Dorothy T.[5] Eventually, on August 29, 2013, Mother was permitted to resume therapeutic supervised visitation. On December 5, 2013, the children were again adjudicated dependent and neglected.

---

[4] Neither party appears to dispute DCS's assertion that Jaylah and Ja'Sontay entered DCS custody on April 18, 2013. The trial court's April 18, 2013 order, however, makes no ruling explicitly placing the children in DCS custody. Indeed, on April 25, 2013, DCS filed a motion for an immediate protective custody order asking that the "temporary care and custody of said children be placed with [DCS]." Also on April 25, 2013, the trial court granted DCS's motion and placed the children in DCS custody. This discrepancy is immaterial in our analysis of the grounds for termination alleged by DCS. However, parties should endeavor to ensure that the facts in their appellate briefs to this Court align with the facts in the record.

[5] The record is unclear as to whether the children remained in the care of Foster Parents after entry of this order. Testimony reveals no disruption in the children's placement with Foster Parents, but this order specifically states that that the children, namely Jaylah and Ja'Sontay would remain with their "current custodian[]s," Dorothy T.

Mother's visitation continued until March 17, 2014, when the trial court entered an order ceasing her visitation because Mother threatened the provider. The trial court stated that it would continue the matter to allow Mother and her attorney an opportunity to secure an alternative provider or supervisor for visitations. Mother suggested one individual to supervise visitation; however, despite DCS's efforts to complete a home study on three separate occasions for this individual and obtain a background check of the suggested individual, it was unable to complete the home study and obtain a background check. The record indicates that Mother did not visit the children after this time.

Eventually, Mother moved the trial court for visitation,[6] but the trial court denied her request on September 4, 2014. The trial court noted that it had concerns with Mother's recent arrest for aggravated assault and the fact that Mother told the trial court to "F" itself. The trial court stated it would permit Mother to reinstate her visitation once she proved to the court she had addressed her mental health issues, including anger management and medication management. Thus, Mother's visitation remained suspended.

On September 29, 2014, a second permanency plan was developed, but the goal was changed to adoption.[7] Under this plan, Mother was tasked with: (1) notifying DCS of any address or telephone number changes; (2) maintaining contact with the DCS caseworker; and (3) visiting a minimum of four hours per month once the No Contact Order was lifted. The second permanency plan was ultimately ratified by the trial court via written order entered on January 16, 2015.

On January 12, 2015, DCS filed a petition to terminate Mother's parental rights to Jaylah and Ja'Sontay. DCS alleged that termination was warranted based on the grounds of abandonment by willful failure to visit; abandonment by willful failure to support; abandonment by failure to establish a suitable home; abandonment by an incarcerated parent; substantial noncompliance with permanency plans; and persistence of conditions. On April 9, 2015, the trial court conducted a trial on DCS's petition. DCS produced evidence through two witnesses, Amber Kirby, a family service worker for DCS, and Emma W., the children's foster mother. Mother's proof consisted of her testimony.

Amber Kirby testified that she is the current family service worker assigned to this case. She explained that DCS initially provided and funded therapeutic supervised visitation for Mother and the children. Ms. Kirby admitted that, when permitted by the court, Mother

---

[6] Mother's motion to reinstate visitation is not in the record on appeal, but we gather that it was filed based on the trial court's order denying it.

[7] The record indicates that another permanency plan was entered into on September 26, 2013. However, in its brief, DCS states that it will not address the requirements and alleged noncompliance with this plan because only the first page of the plan appears in the record on appeal. Accordingly, we similarly decline to address it in this Opinion.

4

regularly attended visitation. According to Ms. Kirby, Mother's visitation was suspended in February 2014 by the provider because "the service provider at the time, Wolfe Counseling sent a letter to [DCS] stating that they could no longer provide visitation anymore due to threats made by [Mother] to the provider." Although the trial court entered an order permitting Mother to resume visitation if she could provide a suitable supervisor, Ms. Kirby testified that Mother failed to do so. Mother provided the name of one individual, but ultimately this individual could not complete a home study and refused to complete a background check. She stated that, at any time, Mother could have provided a suitable supervisor and resumed visitation. Still, according to Ms. Kirby, Mother did not visit the children in the four months leading up to the filing of the petition.

Regarding support, Ms. Kirby testified that Mother never paid any child support for the children, let alone during the relevant four-month period, since they came into DCS custody. On cross-examination, however, she said she was surprised to learn that Mother had child support taken from her wages earned from employment.

In addition, regarding the permanency plans, Ms. Kirby stated that Mother failed to comply with a majority of the components in the plans ratified by the trial court. She stated that Mother never told her that she did not understand the plan, nor did Mother tell her that she did not understand that noncompliance with the requirements of the plan may lead to termination of parental rights. Mother did complete the parenting classes. According to Ms. Kirby, however, Mother failed to comply with all of the recommendations from the psychological parenting assessment; failed to obtain and maintain suitable housing; failed to complete random urine drug screens; and failed to maintain her parole and curb her criminal activity. She also testified that Mother made it exceptionally difficult to keep in contact because she did not reside at the address she gave DCS, despite the requirement of the permanency plan to do so. Furthermore, Ms. Kirby testified that the last mental health appointment attended by Mother was in August 2014.

Ms. Kirby noted that Mother did complete one drug screen on May 2, 2013 after entering into the first permanency plan, on which she tested positive for cocaine. She also stated that DCS attempted to give Mother subsequent random hair and nail follicle drug screens to keep compliant with the permanency plans. In addition to paying for the drug screens, DCS offered to provide transportation for Mother to travel to the screening location. Still, Mother never completed the screens. According to Ms. Kirby, Mother would come at certain times and request a urine drug screen.[8]

---

[8] We infer from Ms. Kirby's testimony that Mother requested a urine drug screen at certain times when she knew she would not test positive for drugs. We further infer that the time frame in which a urine drug screen's ability to analyze whether the participant has used drugs is shorter than other types of screens. Ms. Kirby stated that she ultimately wanted Mother to complete a nail follicle screen because those screens are able

Ms. Kirby testified that the conditions that warranted removal of the children from Mother still existed, namely Mother's drug abuse, criminal activity, and her anger issues. Ms. Kirby stated that when Mother is using drugs, she becomes very angry and aggressive. It is not unusual for Mother to threaten others, even those attempting to help. Further, Ms. Kirby testified that Mother has a long history of criminal activity, including destroying police property, aggravated assault, domestic assault, resisting arrest, and vandalism. According to Ms. Kirby, Mother continues to associate with people who could potentially harm her children.

Foster Mother testified that the children have resided with her and Foster Father for nearly two years, since April 18, 2013. She stated that, altogether, there are five children in the home, and she and her husband have the financial means to provide for all of them. She testified that she and her husband are both retired. Jaylah and Ja'Sontay refer to Foster Parents as "Mama" and "Papa," and have developed a strong bond with them. She testified about one episode where Jaylah began crying when she was taking her to her counselor because Jaylah thought that she was going to be taken away from Foster Parents. Foster Mother believes that removing the children from her home now would be detrimental to them. She said that she and her husband intend to adopt the children if they become available for adoption.

Mother testified last. She acknowledged her history with drug and alcohol abuse[9] but testified that she has been clean and sober for the five months preceding trial. Mother had not submitted to any drug screens during this time, but testified that she was "willing now" to take one. Regarding visitation, Mother testified that the last time she had seen the children was in January 2014. She stated, however, that in June 2014 (nearly a year before trial) when she was released from jail, she contacted her attorney to attempt to get her supervised visitation reinstated. Mother testified that she believed there was a No Contact Order in place preventing her from visiting. In her testimony, she did not acknowledge that the trial court had placed any conditions on her regaining visitation. Still, she stated that she offered the name of one individual to supervise visitation, but, as stated above, that individual did not consent to a background check. Mother also testified that she contacted someone at "Carl Perkins," but "they just don't do supervised visits anymore for nobody." Mother explained that she now resides with her father's niece and that she would supervise visitation; however, Mother never indicated that she had given the niece's name to DCS or the trial court before trial. In response to whether she had abandoned the children, Mother said no.

---

to analyze if the participant has used certain illegal drugs in the last six months, while a hair follicle screen only shows use in the last three months.

[9] The record indicates that Mother began using marijuana and alcohol at age thirteen. She began using cocaine at age twenty-two.

Mother testified that she had been employed at several places, including McDonald's, Popeye's, Fluid Routing & Solutions, Pinnacle Foods, Park Crest Nursing Home, and Black & Decker. She testified that it was difficult to keep a job because of her criminal record. However, Mother testified that she is currently employed. Still, Mother did not offer to name the place where she is employed or testify as to her wages. With regard to the payment of support, Mother testified that child support was always taken out of her check but that she did not know if it ever went to benefit Jaylah and Ja'Sontay specifically. She stated that the payments could have been for her other children or for back child support she admittedly owed.

Mother also testified about different treatment and rehabilitation programs in which she had participated. Although the date is uncertain, Mother went to drug and alcohol abuse treatment at "JACOA."[10] She said, "I don't even think I made it the 90 days. I relapsed. I relapsed probably like at 70-something days." She subsequently registered at Jack Gean Shelter in November 2014. At the shelter, she attended Alcoholics Anonymous ("AA") meetings and group book studies. However, she was eventually discharged by the director of the shelter on February 12, 2015 for being confrontational to another person there. At the time of trial, Mother was not enrolled in any treatment or rehabilitation program but testified that she was relying on prayer and what she learned from the rehabilitation centers to keep herself clean.

Mother testified that she has made numerous positive changes in the time before trial:

> My attitude has changed. That way I talk to people has changed. I'm in church every Sunday. I play the piano at church. I have a job. I'm trying to get stable so I can get me a place.
>
> I live in a safe environment right now with my daddy's niece. She don't use drugs. She ain't never been arrested. She don't drink. She don't do nothing.
>
> . . .
>
> And all I can say is now I mean, I'm different. I mean, I can't tell you when I went five straight months without doing nothing even when I was pregnant carrying my kids I would drink a beer or something. You know, I ain't drunk a beer, I ain't did a drug in five months today.

---

[10] This acronym is undefined in the record.

7

During her testimony, Mother also apologized to the trial court judge for previously being disrespectful in court. Mother asked the trial court to give her one more chance before terminating her rights. She stated that she needed six to nine months before she would be stable enough to provide a home and support for the children.

The trial court entered its ruling on May 1, 2015 and terminated Mother's parental rights to Jaylah and Ja'Sontay. It concluded that clear and convincing evidence supported termination of Mother's parental rights on all of the grounds alleged by DCS, including abandonment by willful failure to provide a suitable home, abandonment by an incarcerated parent, abandonment by willful failure to visit, abandonment by willful failure to support, substantial noncompliance with permanency plans, and persistent conditions. Additionally, the trial court found that clear and convincing evidence demonstrated it was in the children's best interest for Mother's rights to be terminated.

Mother timely appealed.

## II. Issues

As taken from her brief, and slightly restated, Mother raises the following issues on appeal:

> 1. Whether the trial court findings of statutory grounds for the termination of Mother's parental rights is supported by clear and convincing evidence, and whether Mother's failure to provide support was willful;
>
> 2. Whether termination of Mother's parental rights is in the best interest of the children.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-

8

113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the juvenile court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the juvenile court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

Furthermore, in termination of parental rights cases, Tennessee Code Annotated Section 36-1-113(k) provides that the court "shall enter an order which makes specific findings of fact and conclusions of law" within thirty days of the conclusion of the hearing. Section 36-1-113(k) is a reflection of the General Assembly's "recognition of the necessity of individualized decisions in these cases." ***State v. McBee***, No. M2003-01326-COA-R3-PT, 2004 WL 239759, at *5 (Tenn. Ct. App. 2004). Because of the gravity of their consequences, proceedings to terminate a parent's rights to his or her children require such individualized decision making. ***Id.*** (citing ***In re Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999). Furthermore,

as previously stated by this Court, quoting the Tennessee Supreme Court in *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003):

> The trial court is required to find only one statutory ground for termination of parental rights . . . . However, given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, **the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented**. If the trial court addresses each ground that is raised in a termination proceeding, the child's permanent placement will not be unnecessarily delayed due to a remand for findings on alternate grounds.

(Emphasis added.) When a trial court fails to comply with Section 36-1-113(k), "we cannot simply review the record *de novo* and determine for ourselves where the preponderance of the evidence lies[.]" *Id.* at *6.

## IV. Grounds for Termination

In their petition to terminate Mother's parental rights to the children, DCS alleged several grounds: abandonment by failure to provide a suitable home, abandonment by an incarcerated parent, abandonment by willful failure to visit, abandonment by willful failure to support, substantial noncompliance with permanency plan, and persistent conditions. We address each in turn.

### 1. Abandonment by Failure to Provide a Suitable Home

### & Abandonment by an Incarcerated Parent

Before we proceed to the other grounds for termination, we must first discuss the grounds of abandonment by failure to provide a suitable home and abandonment by an incarcerated parent. The trial court found that Mother's parental rights should be terminated as to both of these grounds. DCS, however, in its appellate brief to this Court, appears to concede that the record does not support termination on these two grounds. In its brief, DCS states:

> The ground of abandonment by wanton disregard is only applicable to parents incarcerated at the time the petition [for termination of parental rights] was filed, and Mother was not. [DCS] will not defend this ground on appeal. With regards to failure to provide a suitable home, this ground applies only when the children have been removed from the parent *and*

placed with DCS; because the children were removed in this matter from relatives when they entered DCS custody, this ground is not applicable and [DCS] will not defend [it on] appeal.

Without opining on the merit of these assertions by DCS, we decline to address these grounds for termination based on DCS's abandonment of these issues on appeal. Accordingly, taking DCS's assertion as true that clear and convincing evidence did not exist as to these two grounds, we reverse the trial court's decision to terminate Mother's rights based on these grounds.[11] We turn to discuss the remaining grounds that the parties properly take issue with on appeal.

## 2. Abandonment Generally

Mother appeals the termination of her parental rights on the grounds of abandonment by willful failure to visit and abandonment by willful failure to support pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code Annotated Section 36-1-102(1)(A)(i) respectively. In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

---

[11] Further, although the trial court ultimately entered a conclusion of law as to these grounds, its order does not contain any findings of fact with respect to either of these grounds in contravention of Tennessee Code Annotated Section 36-1-113(k), which requires trial courts to make detailed findings of fact in termination of parental rights cases.

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).

The statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, the four-month period for purposes of establishing abandonment by failure to visit and support is September 11, 2014, until January 11, 2015, the day before the petition was filed.

In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment must be willful. In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .
>
> * * *
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no

12

justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark.App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa.Super. 355, 574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863–64 (internal citations and footnotes omitted).

In determining whether a parent's conduct was willful, it may become necessary in a given case to evaluate events occurring prior to the start of the four-month period. Thus, events occurring prior to the four-month period may bear on the willfulness of the parent's conduct during the four-month period. *See In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) ("Courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child[.]"); *see also In re Keri C.*, No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at *16 (Tenn. Ct. App. Nov. 22, 2010) (explaining that the parent's conduct prior to the four-month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four-month period).

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law *de novo* with no presumption of correctness. *Id.* We turn to the types of abandonment alleged against Mother in this case.

### a. Abandonment by Willful Failure to Visit

We begin with abandonment by willful failure to visit. With respect to this ground, abandonment may be proven by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Here, there is no dispute in this case that Mother had no visitation with the child during the relevant four-month period. Mother argues, however, that her failure to visit with the child was not willful because she was prevented from visiting the child by a No Contact

13

Order of the trial court. In addition, although not argued by Mother, we must address whether Mother's failure to comply with the trial court's conditions to regain visitation constitutes a willful failure to visit.

We first begin by disposing of Mother's assertion that she was thwarted in her visitation by the trial court's No Contact Orders. In order to address Mother's argument, it is necessary to go into more detail regarding the four orders relevant to this issue entered by the trial court. Indeed, the trial court did enter two No Contact Orders, one on April 18, 2013 and again on June 6, 2013, both at least one year prior to the relevant four-month time period.[12]

However, the trial court subsequently entered two more orders regarding visitation, both including conditions upon which if Mother complied, she could regain visitation with the children. The first of the two orders containing conditions was entered on March 17, 2014. In this order, the trial court suspended Mother's therapeutic supervised visitation because Mother threatened the provider. The trial court stated that, although visitation was suspended, the "matter is continued to allow [Mother] and her Attorney the opportunity to find alternative providers/individuals to supervise [Mother's] visitation." Mother suggested one individual. Despite DCS's efforts to complete a home study on three separate occasions for this individual and obtain a background check of the suggested individual, it was unable to complete the home study and unable to obtain a background check. Mother did not suggest another suitable individual to supervise her visitation. Thus, her visitation remained suspended.

Mother subsequently attempted to regain visitation, apparently without providing the court with an appropriate supervisor,[13] but the trial court denied her request on September 4, 2014. This is the second relevant order in the record providing the conditions upon which Mother could regain visitation. In denying Mother's request, the trial court's order provided:

---

[12] The record indicates, however, that Mother visited with the children on August 29, 2013, which tends to show that the No Contact Orders had been dissolved. Even more confusingly, on October 3, 2013, the trial court entered another order ratifying the second permanency plan and granting Mother therapeutic supervised visitation once she submitted to a random drug screen and tested negative. According to DCS, Mother did not submit to any drug screens.

Although these orders are not the operative orders for purposes of analyzing whether Mother willfully failed to visit the children in the relevant four-month period, we point out that both parties failed to address the fact that the trial court ordered Mother to pass a drug screen to regain visitation; Mother did not; and, still, visitation was reinstated. Neither party explains the dissolution of the June 6, 2013 No Contact Order, the mechanism permitting Mother to resume visitation again on August 29, 2013, or why Mother was permitted to visit the children when she did not pass a drug screen pursuant to the trial court's October 3, 2013 order.

[13] Again, we note that Mother's motion to reinstate visitation is not in the record on appeal, but we gather that it was filed based on the trial court's order denying it.

The Court has grave concerns that [Mother] was arrested for aggravated assault. The Court takes judicial notice of [Mother's] conduct in the court, in fact [Mother] told the Court to "F" itself. The Court finds it contrary to the best interest of the children to have visitation with the mother until a time that [Mother] can prove to the Court that she has rehabilitated herself. The Court finds that [Mother] needs anger management and needs to address any mental health issues, including medication management. The Court takes notice that Providers are afraid of [Mother] and that the mother's actions put Providers and others in danger until a time that she has rehabilitated herself.

Consequently, as of the September 4, 2014 order, it appears that Mother's visitation was suspended until she could meet two conditions: (1) establish an appropriate supervisor for the visitation; and (2) establish that she has addressed her mental health and anger issues, which put both the children and visitation supervision providers in danger.[14] The record is devoid of any effort made by Mother to assuage the trial court's concerns in its September 4 order. Thus, it appears Mother's visitation remained suspended into the relevant four-month period, beginning September 11, 2014, up until the petition was filed on January 12, 2015.

In its final order terminating Mother's parental rights, the trial court found that Mother had abandoned the children by willfully failing to visit them. The trial court concluded that it had given Mother explicit directives on how to regain visitation, and Mother's willful failure to complete these directives amounted to a willful failure to regain visitation with the children. In so finding, the trial court stated that Mother's emotional instability "manifested itself [at trial] in her testimony . . . when she dwells upon the fact that she's been under a no contact Order and that she can't see her children and she is unable to come to grips with the reality that in every single Order of the Court in which she was ordered not to have contact with her children it was specifically outlined as to steps that she could take to have contact with her children."[15] The trial court found that Mother willfully ignored the steps she needed

---

[14] The trial court's order on September 4, 2014 provides: "All prior Orders not modified by this Orders [sic] shall remain in effect." Thus, Mother was still obligated under the March 17, 2014 order to provide an appropriate supervisor in order to resume visitation.

[15] The trial court found that "every single Order of the Court" ordering no contact included steps Mother could take to regain visitation. Upon review of the record, this does not appear to be accurate because early in the case the trial court entered two No Contact Orders unequivocally precluding any visitation; however, the orders entered closest to the relevant four-month period *did* outline steps Mother could take to regain visitation.

to take to regain visitation and, as a result, willfully failed to visit her children in the relevant four-month period.[16]

It is undisputed that Mother did not visit the children in the four months before the filing of the petition. We must determine whether Mother's alleged lack of knowledge regarding the No Contact Order and her noncompliance constitutes a willful failure to visit. Where the failure to visit is not willful, it does not constitute abandonment. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). A parent who attempts to visit and maintains a relationship with the child, but is "thwarted by the acts of others and circumstances beyond [her] control," cannot be found to have willfully abandoned the child. *Id.*

As stated above, Mother's sole argument as to this ground is that she believed that a previously entered No Contact Order still prohibited her from visitation with the children. From what we can perceive, Mother appears to argue that she was unaware that the trial court had subsequently entered two more orders (the March 17, 2014 and September 4, 2014 orders), which permitted visitation under certain conditions. A similar argument was advanced in *In re Kiara C.*, No. , 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (no perm. app filed). In *Kiara*, this Court rejected father's argument that his failure to visit was not willful because of an order of the court prohibiting him from contacting the child. *Id.* at *6. Even though there had previously been an order prohibiting father from having contact with the child, the order had been dissolved long before the relevant four-month period, and father's knowledge of its dissolution was immaterial. *Id.* ("If . . . as [father] asserts, he knew that the order of protection had been entered against him, it follows that he at least knew which court had entered it and certainly could have accessed that court record to discover the expiration date.").

Similarly, we must conclude that Mother's alleged belief that a No Contact Order unequivocally prohibited visitation does not support her argument that her failure to visit was not willful.[17] The two orders that contained the conditions for Mother to regain visitation, i.e. the March 17, 2014 and September 4, 2014 orders, were entered after the No Contact Orders, and they provided a mechanism for Mother to regain visitation. These orders clearly

---

[16] Mother's appellate brief to this Court does not address whether she complied with the conditions placed on her regaining visitation by the trial court. In order to ensure that Mother's rights are protected, we have attempted to address any arguments fairly raised by her in the trial court. We note, however, that Mother cited no specific legal authority to this Court with respect to whether her alleged noncompliance with these conditions constitutes willfulness. Thus, we must rely on our own research in this regard.

[17]The trial court specifically included in its ruling that it simply did not credit Mother's testimony, and we find no reason to overturn this finding on Mother's credibility. To this end, the record does not support Mother's assertion that she believed a No Contact Order prohibited her from visitation completely. The testimony indicates that Mother visited with the children at some point after both No Contact Orders had been entered. Thus, her argument that she believed that a No Contact Order still precluded visitation during the relevant four-month period is untenable.

16

supplanted the No Contact Orders entered nearly one year prior (which strictly prohibited Mother from visiting the children at all). Mother was represented by counsel at this time, and there is no allegation in the record that she was never given notice of the additional orders, especially given that Mother initially attempted to comply with the March 17, 2014 order. Accordingly, Mother was free to request visitation again upon completion of the conditions in the trial court's orders of March 17, 2014 and September 4, 2014. We next address whether her failure to do so constitutes a willful failure to visit.

It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness. According to this Court in *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (no perm. app filed): "This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit." (citing *In re Elijah B.*, E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010)). Furthermore, this Court has specifically opined that when a parent chooses not to cooperate with certain conditions, such as obtaining a drug and alcohol abuse assessment, that choice "in refusing to cooperate [] constitute[s] a willful decision" to discontinue visitation. *State Dept. of Children's Servs. v. J.A.H.*, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005).

Mother does not argue that she complied with any of the trial court's conditions to regain visitation. Indeed, the record is devoid of any evidence she fulfilled these conditions. Pursuant to the March 17, 2014 order, Mother provided the name of one potential supervisor for visitation; however, that individual did not consent to a background check. Mother called the Carl Perkins Center, which allegedly informed her that it did not supervise visitations. After these two unsuccessful attempts, Mother offered no more names of relatives, friends, clinics, or other volunteers who could supervise visitation. Instead, the record suggests that Mother simply discontinued any attempt to comply with the trial court's order. Only by the time of trial did Mother attempt to offer another suggested supervision provider. Unfortunately, Mother's proffer of this individual as a supervisor comes too late. *See In re Johnny J.E.M.*, No. E2011-02192-COA-R3-PT, 2012 WL 1929802 (Tenn. Ct. App. May 29, 2012); *see also In re R.T.S.*, No. E2002–02227–COA–R3–JV, 2004 WL 73271, at *6 (Tenn. Ct. App. Jan. 16, 2004) (holding that "Mother's and Father's last minute efforts cannot provide the basis for a conclusion that [this] statutory ground[ ] ha[s] not been proven"); *DCS v. B.L.K.*, No E2002–01724–COA–R3–JV, 2003 WL 21220830, at *8 (Tenn. Ct. App. filed May 20, 2003) (holding that "Mother's last minute ability to secure employment two days before the second day of trial began, as well as the scheduling of a therapy session in the near future is, quite simply, too little too late"). Thus, the evidence shows that Mother

willfully failed to comply with the trial court's March 17, 2014 order involving the reinstatement of her visitation.

Mother's visitation was also limited by the trial court's September 4, 2014 order denying Mother's motion for visitation, in which the trial court provided that Mother could regain visitation if she addressed her mental health issues. Mother produced no evidence to the trial court that she had rehabilitated herself to the point she was capable of visiting with the children without her mental health and anger issues interfering. Indeed, as early as two months before trial, Mother was discharged from the Jack Gean Shelter for her "bad attitude," another display of Mother's failure to tend to her anger issues. Mother's efforts to address these issues appear half-hearted, at best. Mother was represented by counsel and had access to assistance and guidance from a DCS caseworker. Yet, in her own testimony, she states that she "d[oesn't] even know where I go to do" anger management therapy. She testified that she called a clinic one week prior to trial to try to get mental health counseling, but she had not been able to complete counseling. Mother had knowledge of the conditions placed on her visitation, such as mental health counseling, as early as September 4, 2014. Still, Mother waited until a week before trial to attempt to get an appointment. She offered no explanation as to why she waited approximately seven months to do so. Accordingly, we find Mother's efforts in this regard again to be "too little, too late." *See In re Johnny J.E.M.*, 2012 WL 1929802 at *12; *see also In re R.T.S.*, No. E2002–02227–COA–R3–JV, 2004 WL 73271, at *6; *DCS v. B.L.K.*, 2003 WL 21220830, at *8. We conclude that DCS has carried its burden to show that Mother's failure to at least attempt to fulfill these conditions constitutes a willful failure to visit.

Not only did Mother fail to fulfill the conditions, but we also note that the suspensions of her visitation stemmed from her own misconduct. The March 17, 2014 suspension of Mother's visitation came after Mother threatened the visitation provider. Again, on September 4, 2014, the trial court suspended Mother's visitation due to her arrest for aggravated assault and also telling the trial court to "F" itself. Thus, all of the obstacles preventing Mother from visiting her children stem from her own actions or her own failure to act.

Respectfully, we conclude that Mother's own misconduct and failure to heed the recommendations of the trial court and DCS has consistently been an obstacle to her regaining visitation. DCS has carried its burden by demonstrating that Mother has failed to complete any of the conditions required for her to regain her visitation. Thus, we must conclude that clear and convincing evidence supports the trial court's finding that Mother willfully failed to visit the children.

### b. Abandonment by Willful Failure to Support

The trial court concluded that Mother abandoned the children by her willful failure to support them during the relevant four months preceding the termination petition. For purposes of this subdivision of abandonment, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as support that "under the circumstances of the individual case, is insignificant given the parent's means." *Id.* at (1)(B).

The trial court's order expressly provides that Mother has "willfully failed to contribute to the support or make reasonable payments toward the support of the children for more than four (4) consecutive months prior to the filing of the Petition for Termination of Parental Rights." Despite its conclusion, the trial court did not make any findings of fact concerning Mother's obligation to make child support payments for her children. The trial court's oral ruling, which was not incorporated into its written order, similarly does not include findings of fact concerning this ground.

In the absence of appropriate findings and conclusions under Section 36-1-113(k) regarding Mother's payment of support, we cannot determine whether Mother's failure to support the children was willful. Such a determination typically involves consideration of whether a parent was able to be employed, whether the parent was employed, what other expenses the parent was required to pay, and any other relevant considerations. The trial court's order fails to address any of these considerations. The trial court's "failure to comply with [Tennessee Code Annotated Section 36-1-113(k)] fatally undermines the validity of" the trial court's order with respect to this ground. *See In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). Accordingly, we vacate the trial court's decision to terminate Mother's parental rights on the ground of abandonment by willful failure to support.

### 3. Substantial Noncompliance with Permanency Plans

Mother's parental rights were also terminated on the ground of substantial noncompliance with her responsibilities in the permanency plans. Tenn. Code Ann. § 36-1-113(g)(2). As discussed by this Court in *In re M.J.B.,* 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the

conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine,* 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.,* 2003 WL 21266854, at \*12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine,* 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.,* No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at \*18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

In this case, DCS promulgated three separate permanency plans. As set out in more detail above, Mother's responsibilities under the parenting plans included, *inter alia*, keeping DCS informed of address or telephone number changes; maintaining contact with the DCS caseworker; visiting with the children regularly; participating in parenting classes; completing and following the recommendations from a mental health assessment; obtaining and maintaining suitable housing; avoiding criminal activity; gaining employment; and submitting to and passing drug screens.

The trial court terminated Mother's parental rights based on her alleged substantial noncompliance with the permanency plans. In its written order, the trial court stated:

> 29. The Court further finds [Mother] **has not substantially complied** with the provisions of the permanency plan and her parental rights should be terminated pursuant to **T.C.A. 36-1-113(g)(2).**

(Emphasis in original.)

Unfortunately, similar to the ground of abandonment by failure to support, the trial court failed to make any other findings of fact or conclusions of law with respect to this ground for termination.[18] In addition to the above conclusion of law, the trial court's order

---

[18] This Court faced a similar issue in *In re A.C.S.*, No. W2015-00487-COA-R3-PT, 2015 WL 5601866 (Tenn. Ct. App. Sept. 23, 2015) concerning inadequate findings of fact and conclusions of law with the same trial court in the case-at-bar. Here, the confusion is heightened as the trial court's final order includes

merely states that Mother failed to comply with the recommendations of DCS. The trial court does not discuss any of the specific requirements, Mother's alleged failure to comply, or whether Mother's noncompliance was substantial. In addition, the trial court appears to apply an incorrect standard with regard to this ground. The trial court concluded that Mother had not "substantially complied" with the plans' requirements. Rather, the appropriate standard is whether there has been "substantial noncompliance." *See* Tenn. Code Ann. § 36-1-113(g)(2). In the absence of appropriate findings on this ground and the application of an incorrect standard, we vacate the trial court's decision to terminate Mother's parental rights on the ground of substantial noncompliance with the permanency plans.

### 4. Persistent Conditions

We next consider the issue raised by Mother regarding the juvenile court's finding of persistence of conditions. Mother argues that she has remedied the conditions that warranted removal. She asserts that she did not partake in criminal activity in the four months preceding trial; that she had taken and completed parenting classes, the most recent occurring at some point in 2013;[19] that she attempted to deal with her substance abuse issues at two rehabilitation centers; and that her discharge from the Jack Gean Shelter was related to a confrontation with another person there, and not drug-related.

Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

one section regarding findings of fact and does not delineate certain facts as applying to certain grounds. This practice presents a challenge to this Court on appeal, leaving us to speculate which facts the trial court applied to each ground in applying the standard of clear and convincing evidence. The better practice is to include separate findings supporting each ground specifically, as required by the Tennessee Supreme Court. *See **In re D.L.B.**,* 118 S.W.3d 360, 367 (Tenn. 2003) ("[T]he trial court should include in its final order findings of fact and conclusions of law **with regard to each ground presented**.") (emphasis added). We urge judges and litigants to be thorough in the preparation of orders, especially when the rights of parents and minor children are involved.

[19] Mother testified that she recently signed up for another parenting class, which started the week before trial. She had attended one class but did not attend during the week of trial because it was storming.

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008))).

In concluding that the ground of persistence of conditions was proved by clear and convincing evidence, the trial court found that Mother had developed a pattern of drug and alcohol abuse, violent and threatening behavior, and criminal activity that had not been remedied sufficient enough to allow the child to return to the home at an early date. We agree.

In this case, it is undisputed that both children have been removed from Mother's care for over six months. *See* Tenn. Code Ann. § 36-1-113(g)(3). Despite Mother's best efforts, the record includes clear and convincing evidence that Mother's mental health and substance abuse issues still remain an obstacle to the children being safely returned to her in the near future. Although the children have been removed from Mother's care for over three years, Mother testified that she still needs between six and nine months before she was ready to potentially care for the children.

Mother's struggle with her mental health and anger issues remain a concern for this Court. A mere two months before trial, Mother was discharged from the Jack Gean Shelter for her confrontational attitude toward others. Mother knew that she had to curb her explosive behavior, yet she let her emotions take over, leading to the discharge. Sadly, this demonstrates that it is uncertain whether she would be able to care for the children even within the timeframe that she testified to at trial. This is exacerbated by the fact that Mother faced numerous criminal charges in the year leading up to trial, including charges for domestic assault, felony vandalism, resisting arrest, and disorderly conduct.[20] To this end, Ms. Kirby testified that it would be unsafe to return the children to Mother because she "has maintained . . . patterns of substance and alcohol abuse, patterns of neglect and abuse and her criminal activity and has continued to associate with people who could potentially harm her children."

With respect to her addiction issues, Mother had at least two chances to receive professional rehabilitation for her substance abuse problems, but again, her own misconduct lead to the demise of these opportunities. Additionally, although we commend Mother for her work to stop abusing drugs and alcohol on her own, the trial court found Mother not to be a credible witness. Indeed, although Mother testified that she had not abused drugs in the four months preceding the trial, other testimony shows that Mother often refused or failed to complete drug screens when requested by DCS. Further, Mother testified that her current living arrangement with her father's niece would not permit the children to reside with her. Finally, although Mother hoped to be able to independently rear the children several months in the future, she failed to offer any concrete steps that she was taking to make this projection a reality. The cumulative effect of these conditions makes it unsafe and unworkable for the children to be returned to Mother soon. Although we commend Mother's efforts and do not want to discourage further positive progress, it is unlikely she is in a position where the children can be returned to her in the near future. Instead, it appears that the children now reside in a safe and stable home and that Mother's continued involvement may prevent them from being adopted by foster parents.

In light of the foregoing, we affirm the trial court's decision finding clear and convincing evidence to support the ground of persistent conditions.

## V. Best Interest of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App.

---

[20] Mother incurred these charges in May 2014. On June 6, 2014, she was convicted of domestic assault and vandalism for kicking the windows out of the back of a police patrol car. Charges against her for resisting arrest and disorderly conduct were dismissed.

1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian

24

consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Based upon the foregoing discussion, it is clear that Mother has struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in the children's best interest to be in her care. Despite DCS's efforts and the efforts of various agencies, discussed *infra*, Mother has failed to make a lasting adjustment, as evidenced by the fact that, *inter alia*, she has yet to complete a rehabilitation program and she has had recent displays of threatening behavior. Although her testimony was not credited by the trial court, Mother stated she was attempting to address her addiction issues on her own and through prayer. However, Mother was unable to complete even one rehabilitation program in the years that the children have been removed from her care. Rather than working toward the return of the children, it appears that Mother continued to engage in criminal behavior and other misconduct until shortly before the termination petition was filed, over ten years after

DCS first became involved in Mother's life and approximately four years after the children were last removed from her care. More importantly, it is questionable whether her current mental health issues would promote the children's well-being if returned to her, as suggested by Ms. Kirby's testimony regarding her often-threatening behavior and her discharge from the Jack Gean Shelter. Additionally, her noncompliance with the recommendations of the trial court and DCS demonstrates that she stills lacks the ability to prioritize her children's needs over her own.

The record indicates that the children have done well in Foster Mother's care. They have been in Foster Mother's home since April 18, 2013. Foster Mother testified that she and her husband are able to financially support the children, and the children are comfortable in their home. She stated that they intend to adopt the children if they become available for adoption. Further, she testified that they have fostered a strong bond with the children, who refer to her and her husband as "Mama" and "Papa." She stated that the children have not asked about Mother since visitation ceased in February 2014.

Both Foster Mother and Ms. Kirby testified that the children are doing well in their foster home. They are making As and Bs in school. Jaylah receives regular counseling twice a month, and Ja'Sontay has completed counseling. Ms. Kirby stated that the foster parents are able to meet the children's educational, emotional, and spiritual needs. To remove the children at this point, according to the record, and place them in what is still an unstable environment with Mother would likely have a detrimental effect on the children.

Applying the foregoing statutory facts, and for the stated reasons, it is clear that Mother has not made a lasting change in her conduct or condition that would allow the children to return to her care at an early date. While this Court does not doubt Mother's love for her children, the record does not support her assertion that she would be able to provide the children with the emotional and developmental support that they require at this stage in their young lives. From the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the children's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to the children on the grounds of abandonment by willful failure to visit and the persistence of conditions. We reverse the trial court's decision to terminate Mother's parental rights on the grounds of abandonment by failure to provide a suitable home and abandonment by an incarcerated parent. We vacate the trial court's decision to terminate Mother's parental rights on the grounds of abandonment by willful failure to support and substantial noncompliance with the permanency plans due to inadequate findings of fact on

these issues. Accordingly, because we have affirmed on two grounds, we affirm the finding of grounds to terminate Mother's parental rights. We also affirm the trial court's conclusion that it is in the children's best interest to terminate Mother's parental rights. This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant Mother. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE