IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 3, 2022 Session

## IN RE TRISTAN H.

**Appeal from the Juvenile Court for Sumner County**
**No. 2018-JV-167    David Howard, Judge**

_____

### No. M2021-00618-COA-R3-PT

_____

This is an appeal from a termination of parental rights proceeding.  As to the mother of the child at issue, we vacate the trial court's termination of her parental rights due to procedural concerns that are acknowledged by the Department of Children's Services.  With respect to the father of the child, however, we conclude that one ground for termination was properly established.  We further conclude that the evidence clearly and convincingly shows that the termination of the father's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part; Affirmed in Part; Reversed in Part; and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Bruce N. Oldham, Gallatin, Tennessee, for the appellant, Brenn H.

Herbert H. Slatery, III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Courtney J. Mohan, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

At issue in this case is the child Tristan H.[1] ("Tristan").  Tristan is the son of Brenn H. ("Father") and Rachel L. ("Mother").  Although the parental rights of both Father and Mother were terminated by the trial court in the underlying proceedings, our factual presentation herein is largely tailored to Father for reasons that will be evident in our

_____

[1] In termination cases, it is the policy of this Court to redact certain names in order to sufficiently protect the identities of the children involved.

ensuing discussion.

In March 2018, Tristan's paternal grandmother ("Grandmother") filed a petition in Juvenile Court raising fears she had about Tristan's safety. In relevant part, Grandmother averred that Father and Mother "continue to endanger [Tristan] by their daily substance abuse of alcohol." Grandmother's petition also referenced domestic violence concerns, and she requested that she be given temporary custody of Tristan. Grandmother was subsequently awarded temporary custody, but in August of that same year, Tristan was placed in the custody and control of the Department of Children's Services ("the Department"). At that time, a Juvenile Court magistrate found that Grandmother was "unable to protect" Tristan. Tristan subsequently entered the foster care system and was placed with his current foster home in September 2018.

A number of permanency plans were created following Tristan's placement in the Department's custody, and these plans were in large part similar with respect to the responsibilities they imposed on Father. Among other things, the plans attempted to address concerns that existed as to Father's substance abuse, housing situation, and financial stability. In January 2020, over a year after the first permanency plan was developed, the Department filed its termination petition against him and Mother. In the petition, the Department alleged that Father had "not substantially complied with the responsibilities and requirements set out for him in the permanency plans" and contended that the termination ground commonly known as persistence of conditions was applicable, as well as the termination ground codified at Tennessee Code Annotated section 36-1-113(g)(14). A trial on the petition took place in April 2021.

The proof at trial highlighted various concerns that existed as to Father's stability and ability to provide care for Tristan, including but not limited to concerns that existed over Father's alleged use of drugs. The proof also highlighted the positive environment surrounding Tristan's foster placement. Tristan, who had entered foster care several months before his first birthday, was over three years old by the time of trial.

The first witness to testify, Joe Beavers ("Mr. Beavers"), stated that he had been the Department case manager for this matter since December 2018. Mr. Beavers noted that although Father had completed an alcohol and drug assessment and recommended alcohol and drug education, he had subsequently tested positive for methamphetamine.[2] More alcohol and drug education followed, but after another hair follicle test, Father again tested positive for methamphetamine. Mr. Beavers testified that a second isomer test run at the lab was able to confirm "100 percent" that it was methamphetamine.[3]

_____

[2] Father also tested positive for amphetamine. Mr. Beavers testified that he was able to confirm that Father took Adderall (an amphetamine), although he had not actually seen a prescription for it.

[3] Father had reportedly previously claimed that he tested positive due to "medication."

- 2 -

These results obviously were a source of concern for the Department. Mr. Beavers tried to get other drug screens of Father, and he testified that there were times when Father "would not come in." Mr. Beavers further testified that, on other occasions when Father did show up, Father "went ahead to the restroom instead of waiting . . . after he agreed to do the screen, he went ahead and went to the restroom instead of waiting for me."

The concerns about Father's drug usage were not allayed by the time of trial, as Mr. Beavers testified that he still had concerns that Father was using illegal drugs. Mr. Beavers stated that the Department had funded a hair follicle test in October 2020, noting further that "[Father] stated that he would go to Workforce Essentials where it's done, and he did not go." Mr. Beavers continued on in his testimony, stating, "We also requested another in November, and he stated that he would go, and he did not go." According to Mr. Beavers, Father did not give an excuse or offer an explanation but had instead responded with concern as to why Mother did not have to do hair follicle tests.[4]

Concerning Father's employment status, Mr. Beavers noted that Father had represented during a January 2021 Child and Family Team Meeting that he was not working. Further, he testified that Father did not produce any documents showing that he had been employed. Although Mr. Beavers stated that he had offered on several occasions to drive Father around to look for jobs and housing, Father reportedly never took advantage of that offer. Father had shown Mr. Beavers verification of food stamps, but he reportedly never provided documentation of alleged unemployment benefits. Mr. Beavers testified that he had expressed to Father the need to have an income to support himself and Tristan, and he further noted that Father had "maybe" made one child support payment.

As for Father's housing situation, Mr. Beavers testified that Father had often stated throughout the case that he did not have housing. He also testified, however, that Father had recently represented that he uses Grandmother's home as housing. Father's indication that he lived with his mother caused Mr. Beavers to have concern for Tristan's safety, testifying, "It was a removal house and there was some environmental issues in the past when Tristan was removed. I did go to attempt to visit the home to see if there were any other safety issues, and he stated that I could not come in the home." Although Father had denied access to the home because he said he was "going to be leaving," Mr. Beavers noted that the two of them had "stood on the porch and talked for ten minutes." As Mr. Beavers later stated, "And I asked him a couple times because we'd been standing on the porch, so we might as well go in." Because he was denied access to the home, Mr. Beavers could not confirm whether there had been any amelioration of the environmental concerns in the home. Later during the trial, old photos of the home were introduced, depicting a highly cluttered interior.[5]

---

[4] Mr. Beavers testified that he never requested hair follicle screens on Mother because he needed to "know where she was in order to [make the] request."

[5] Although Father claimed during his testimony that the home was different now, he admitted that

According to Mr. Beavers, Father had not signed a lease or mortgage for a home outside of Grandmother's home. He further testified that the Department had made Father aware that his mother's home was not appropriate housing on multiple occasions, and the proof at trial revealed significant concerns connected to the relationship between Father and Grandmother. For instance, Mr. Beavers testified that Father was arrested in April 2020 on a "gun charge, a domestic violence charge," with Grandmother being the alleged victim. As reflected in the affidavit of complaint regarding this incident:

> [Officers] seperated [sic] [Grandmother and Father]. Upon investigation . . . [Grandmother] stated . . . that she was scared that [Father] was going to hurt her. . . . [Grandmother] stated that [Father] was threatening her with the gun. She said that he was going to shoot her. Upon talking to [Father] he stated to me that if he could not get his safe out of the house that it would not end up good. Officer Hardin went inside and talked to [Grandmother]. Officer Hardin and myself talked about the situation. Officer Hardin stated to me that [Grandmother] told him that [Father] [threatened] to shoot up the Womans Rescue Mission in Nashville where [Father's] girl[]friend was staying at. . . . After [Father] was in custody, Officer Hardin searched the bag that was laying on the porch and found a 44 mag revolver with 4 bullets in the cylinder. [Father] was charged with a prior domestic in 2017.

Father ultimately pleaded guilty to this domestic assault charge (albeit while later denying at trial that he had made threats to Grandmother), and as evidenced by his own testimony discussed *infra*, law enforcement continued to be entangled in the lives of Father and Grandmother even through the next year.

Mr. Beavers asserted that the problem in this case was that the Department would help Father "move forward a step" but that then Father would "take two steps back." In addition to concerns about Father's drug usage, housing situation, and income, Mr. Beavers reported that Father had not completed any form of domestic violence counseling. He further testified that Father had not been to therapy since 2018. Mr. Beavers was concerned that Father was not able to take care of Tristan and expressed fear that Father's continued drug problems would put Tristan at risk of harm. Moreover, Mr. Beavers noted that Father had never moved to unsupervised visitation with Tristan. According to Mr. Beavers, Tristan has several allergies, and Father had almost given Tristan food that he should not have on more than one occasion.

Mr. Beavers testified that Tristan was "doing very well" in his foster home and was bonded with the foster mother, who Tristan calls "mom." Mr. Beavers additionally noted that Tristan and another child in the foster home are extremely close, and he expressed concern that moving Tristan from his foster home would be disruptive.

---

the Department would not know that the home was satisfactory other than through his word.

Following Mr. Beavers' testimony, the trial court heard from Dominique Chandler ("Mr. Chandler"), an Omni Visions employee who supervised Father's visitations with Tristan. Mr. Chandler did not have any major concerns with the visitations that occurred in this case in terms of the actual interactions between Father and Tristan, but he did note that "punctuality has been an issue." Mr. Chandler claimed that Father was not punctual "[a]rguably every visit," being "[b]etween 10 and 15 minutes" late. Mr. Chandler also testified that Father had missed certain visitations, including two in the month before trial.

Next to testify was Tristan's foster parent, Christina W. ("Foster Mother"). Foster Mother testified that Tristan came to stay with her when he was nine months old. She stated that she has two other children and that Tristan is "best friends, best buddies" with her oldest son. She claimed that Tristan calls her "My mommy or Mommy," and when asked if she would be willing to adopt Tristan, Foster Mother indicated that she would. Although Foster Mother stated that she believed Father and Tristan had a bond, she testified that she thinks Tristan is young enough to adapt.

For his part, Father acknowledged during his trial testimony that he had periods during the case when he was unemployed. He also stated, however, that there were periods where he had employment. Father testified that he previously worked through a temp services provider, and that in November 2020, he had worked at a "mattress place" before subsequently quarantining himself after seeing a doctor. When asked if he had ever held a job for longer than two weeks during this case, Father noted that he had "helped with my brother." Although he further claimed that there was another place where he had worked for at least two weeks, Father acknowledged that he had not provided the Department with proof of employment. Father testified that he had reapplied for unemployment benefits "about seven weeks ago, and . . . started getting benefits about five and a half weeks in." Father appeared to suggest that his overall situation had changed by the time of trial and would continue to progress favorably. He testified that he got a car two weeks before trial, and given the availability of that resource, he agreed, when asked, that he should be given more time to turn things around.

On the issue of drugs, Father's testimony indicated that none of the drugs he was prescribed are classified as methamphetamines. Regarding alcohol use, Father testified that he last had a drink two months before trial, and although he stated that he had previously attended Alcoholics Anonymous and got up to step eight on the twelve-step program, he was no longer attending. As for his living situation and his relationship with Grandmother, Father acknowledged his guilty plea to a domestic assault charge. He also testified that Grandmother calls the police more than the average person. He admitted that law enforcement had been out to the home as recently as the year of trial, and he testified that Grandmother would ask him to leave her home about once or twice a year. When asked why his mom requested him to leave, Father replied that it "depends on what kind of mood she's in." Although Father was still living with Grandmother, he claimed that she was in the process of moving. He also testified that if he "get[s] enough for a place before

that" he would not be moving with her.

On May 6, 2021, the trial court entered an order terminating the parental rights of both Mother and Father. As to Father specifically, the trial court found that three grounds for termination were established, including Father's failure to manifest a "willingness and ability to personally assume legal custody and physical custody or financial responsibility of the child." *See* Tenn. Code Ann. § 36-1-113(g)(14). The trial court also concluded that the termination of Father's parental rights was in Tristan's best interests. This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we

must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

Although only Father filed a notice of appeal from the trial court's judgment, this Court previously had certain concerns connected to Mother and whether or not she had proper notice of this appeal. We requested supplemental briefing regarding certain of our concerns in a February 8, 2022 order,[6] while also seeking clarification from the trial court clerk as to whether an affidavit of diligent inquiry under Tennessee Code Annotated section 36-1-117(m)(3) had been filed with the trial court as it related to efforts to serve Mother with the petition to terminate her parental rights. When the trial court clerk thereafter submitted an affidavit indicating that no such filing had been made as to Mother, a party who was served by publication and against whom the case was tried *in absentia*, we entered an order requesting supplemental briefing on that issue as well. In relevant part, we directed briefing on the question of "whether the termination of Mother's rights should be vacated due to the absence of an affidavit of diligent inquiry from the trial court record."

The Department, which is represented by the Office of the Attorney General, has since submitted supplemental briefing acknowledging that the termination of Mother's rights should be vacated due to the absence of an affidavit of diligent inquiry from the trial court record. In relevant part, the Department concedes that, although the trial court authorized service on Mother by publication, it did so in a manner that "does not meet the statutory requirement." Father's supplemental briefing echoes the Department's service concerns as to Mother, arguing that this Court has "no choice but to vacate the judgment against the Mother."

In light of what the record shows on this issue and the Department's concession about the matter, we agree that vacating the termination of Mother's parental rights is the appropriate course of action. As this Court has stressed before, service of a biological parent is not a perfunctory act but has constitutional dimensions. *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *6 (Tenn. Ct. App. June 3, 2003). Although service by publication can be permissible, Tennessee law requires, as already alluded to, that any motion for an order for publication in a termination proceeding "be accompanied by an affidavit of the petitioners or their legal counsel attesting, in detail, to all efforts to determine the identity and whereabouts of the parties against whom substituted service is sought." Tenn. Code Ann. § 36-1-117(m)(3). Here, there is no dispute that this was not done. Consistent with the Department's argument on the issue and acknowledgment of its

---

[6] This Court may in its discretion consider issues other than those that have been presented in order to, among other reasons, prevent injury to the interests of the public and prevent prejudice to the judicial process. Tenn. R. App. P. 13(b).

failure on this matter, we therefore vacate the termination of Mother's parental rights and remand for the maintenance of further proceedings as to her that are not inconsistent with this Opinion.

In our view, our decision to vacate the termination of Mother's parental rights mollifies any potential concerns associated with Mother's awareness, or lack thereof, of these appellate proceedings. Continuing on to address the substance of Father's appeal does not prejudice her, nor does it, of course, prejudice Father, who initiated this appeal in response to the final judgment entered against him. Accordingly, we now proceed to address the substance of this appeal as it concerns the termination of Father's parental rights.

Although three grounds for termination were found against Father, the Department concedes on appeal that the record lacks sufficient evidence to support the persistence of conditions ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(3). We accordingly reverse the trial court's reliance on that ground for termination and turn our attention to the remaining grounds found against Father, both of which the Department defends on appeal.

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Pursuant to Tennessee Code Annotated section 36-1-113(k), the trial court's order must contain "specific findings of fact and conclusions of law." *See* Tenn. Code Ann. § 36-1-113(k). The requirement for specific findings in termination orders is a highly significant one and "reflects the Tennessee General Assembly's recognition of the

necessity of individualized decisions in these cases." *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at \*3 (Tenn. Ct. App. Nov. 13, 2003). Moreover, it "reflects the legislature's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals." *Id.* "Meticulous compliance" with the mandates of Tennessee Code Annotated section 36-1-113(k) is required, *In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244, at \*3 (Tenn. Ct. App. Apr. 25, 2012), and "[w]hen a trial court fails to enter an order containing adequate findings of fact and conclusions of law with regard to all alleged grounds for termination, the Tennessee Supreme Court has instructed the appellate courts to remand the case to the trial court for the preparation of appropriate written findings of fact and conclusions of law." *In re C.R.B.*, 2003 WL 22680911, at \*4. We have previously urged judges and litigants to be thorough in the preparation of orders, particularly when the rights of parents and minor children are involved. *In re Jaylah W.*, 486 S.W.3d 537, 554 n.18 (Tenn. Ct. App. 2015).

In this matter, there is a technical concern as to whether the trial court applied the proper standard governing this ground for termination. Whereas the trial court's order contains a general conclusory recital at the end of its analysis on this ground that Father is "in substantial noncompliance," its preceding analysis raises some questions as to what standard was actually applied and considered. First, we observe that the court remarked that continuing "problems" with the case "equate[d] to substantial noncompliance." It is unclear how this speaks to the statutory standard. Substantial noncompliance is evaluated in reference to the "statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). That "problems" exist with a parent in a given case may be relevant to any number of issues in a termination proceeding (and even tangentially so to this ground for termination), but the inquiry under this ground is specifically whether the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" *Id.* It is unclear from the trial court's reference to "problems"—and its equation of "problems" to substantial noncompliance—whether the court actually conducted the required analysis. Furthering our concern on this issue is the fact that when the trial court did specifically reference the responsibilities of the permanency plan, the court noted that Father had "still not substantially complied" with applicable requirements. This is a concern, because as we have noted in previous decisions, "[t]he relevant issue is not Father's substantial compliance with regard to the permanency plan. Instead, the appropriate standard is whether there has been 'substantial noncompliance.'" *In re K.W.*, No. M2021-00408-COA-R3-PT, 2021 WL 5783355, at \*10 (Tenn. Ct. App. Dec. 7, 2021). Here, inasmuch as there is uncertainty in light of the included findings as to whether the trial court actually applied the correct standard under the statute, we vacate this ground for termination with respect to Father. Given our ultimate disposition herein, however, which includes an affirmance of the trial court's termination of Father's parental rights, we do not remand for further findings pursuant to the proper standard.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Child*

The remaining ground for termination at issue is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires the Department to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first "prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first of the aforementioned prongs, the Tennessee Supreme Court has recently clarified that the statute "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Therefore, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.*

In finding that this ground was established, the trial court acknowledged that there was proof indicating that Father had a willingness for reunification with Tristan. Nonetheless, the court observed "that this case began in 2018, that termination was filed in 2020, and that even a year after the filing of said termination there have been no significant changes made." The court stated that "promises cannot be enough and chances have been exhausted. Change must occur." In relevant part, the trial court observed that Father had "never demonstrated consistent financial capability" and "only asked for more time." Further findings were made as to the inappropriateness of Father's living situation, with the court noting that this too was something Father was allegedly "working on" but without a "concentrated effort to relocate." Reintroducing the child to Father's home environment, the court found, "would pose a risk of substantial harm." The trial court further referenced the testimony at trial as to how Father "sometimes presented the child with inappropriate

food."

Having reviewed the record transmitted to us on appeal, we agree with the trial court's conclusion that this ground was sufficiently established. As it specifically relates to Father's failure to manifest an ability to assume custody of Tristan, we take stock of, among other things, all the evidence pointing to drug use by Father and Father's failure to establish suitable living quarters for Tristan. We agree with the trial court that Father's home situation is particularly problematic and evidences a failure on Father's part to show he is capable of assuming custody of Tristan. Although representations were made that change might be in the air in the future, the fact remains that Father was still living with Grandmother. As the trial court noted, there was a "continued police presence" at that home, and Father and Grandmother were previously involved in a domestic violence incident during the pendency of this custodial episode. Based on this record, Father has simply not demonstrated an ability to assume custody of Tristan, and we agree with the trial court that placing Tristan in Father's custody would pose a risk of substantial harm to him. Beyond the concerns pertaining to drug use and Father's home, there is of course the undisputed fact that Tristan has been in the stability of his current foster family for the overwhelming majority of his life.

*Best Interests*

When at least one ground for termination has been properly established against a parent, as is the case here, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). Accordingly, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings.[7] These

---

[7] Although not pertinent to this case, we observe that the best interest inquiry was recently modified by statute. *See* 2021 Tenn. Pub. Acts., ch. 190, § 1; *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *5 n.5 (Tenn. Ct. App. July 14, 2021) (noting that the General Assembly listed additional factors to be considered under an amended version of the best interest statute).

- 11 -

factors are as follows:

> (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8)    Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9)    Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

When the trial court considered the best interest factors, it noted that "Father's circumstances have . . . generally remained unchanged." The trial court noted that Father's home environment "remained problematic and unstable" and referenced Father's domestic violence conviction involving Grandmother. It further noted Father's "tenuous" financial situation. Father was, the court observed, "stuck in neutral, with promises to change, but no lasting efforts to make those changes." The trial court gave Father credit for participating in therapeutic visitation with the child, but it noted a number of remaining

concerns that existed. Beyond the issue of housing, which the court described Father as having "no solid or definite plan to change," the court noted, among other things, that there was no record that Father had completed domestic violence counseling. The court further observed that concerns over continued substance abuse remained.

Although Father had regularly visited with Tristan, the trial court characterized their relationship as "limited" given the early age at which Tristan left his care and the fact that their subsequent visitations were all supervised. The trial court further found that "removing the child from an environment in which he is thriving would wreck both his short and long term potential." Moreover, the trial court cited "continued concerns for the potential of continued domestic violence" given, among other things, the domestic violence that had previously taken place between Father and Grandmother. In painting with a broad brush to summarize the narrative it had gleaned from the proof, the court remarked, "[T]he only consistency shown by the Father is a lack of consistency."

We discern no error in the trial court's weighing of the above considerations and its ultimate best interests conclusion in light of same. The proof clearly shows, as the trial court readily acknowledged, that multiple concerns remain as to Father's ability to serve as a proper custodian and parent for Tristan. This is so despite the fact that Tristan has been removed from Father's care for several years now. Tristan, in fact, has been in Foster Mother's care for the majority of his life. He is doing extremely well in that placement according to the proof, and he deserves permanency and stability as he continues to grow in his young life. Accordingly, we are of the opinion that there is clear and convincing evidence to support the conclusion that termination of Father's rights is in Tristan's best interests.

## CONCLUSION

The trial court's termination of Mother's parental rights is vacated. As to Father, we reverse the trial court's reliance on the persistence of conditions ground for termination given the Department's concession that the ground was not sufficiently supported. Further, in light of our discussion herein, we vacate the substantial noncompliance with permanency plan ground relied upon by the trial court. The trial court's termination of Father's parental rights is otherwise affirmed.

                                   s/ Arnold B. Goldin
                                    ARNOLD B. GOLDIN, JUDGE