IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2023

**IN RE AUBRIA H. ET AL.**

**Appeal from the Juvenile Court for Humphreys County**
**No. J-13446-22        Haylee Bradley-Maples, Judge**

_____

**No. M2023-00329-COA-R3-PT**

_____

This appeal involves the termination of a mother's parental rights to two minor children. The trial court concluded that several grounds for termination existed and that the termination of the mother's parental rights was in the best interests of the children. Although we vacate two grounds for termination, we affirm the trial court's reliance on the remaining grounds for termination and its best interests determination. The trial court's termination of the mother's parental rights is accordingly affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed in Part, and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Blake C. Kruse, Dickson, Tennessee, for the appellant, Courtney H.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Mara Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

BACKGROUND AND PROCEDURAL HISTORY

*General Background*

This case concerns the termination of parental rights of Courtney H.[2] ("Mother") to

_____

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, where appropriate, certain surnames appearing herein will be presented by use of initials.
[2] In the underlying litigation, the parental rights of Geoffrey O. ("Father") were also terminated. As should be evident, however, this Opinion is largely devoid of references to Father insofar as his rights

the minor children at issue herein, Aubria H. and Gabrien H. Aubria and Gabrien (collectively "the Children") were born in March 2014 and July 2016, respectively. The Children were brought into the custody of the Tennessee Department of Children's Services ("the Department") pursuant to a June 8, 2021, protective custody order that followed the filing of a petition to declare the Children dependent and neglected. Pursuant to the protective custody order, the Humphreys County Juvenile Court ("the trial court") found that there was probable cause to believe the Children were dependent and neglected. In articulating the basis for this finding, the trial court initially noted that the Department had received a referral on May 16, 2021, alleging sexual abuse and lack of supervision, and that the Department had "attempted to locate the family for three weeks due to the family having a history of homelessness." As further detailed by the protective custody order:

> On May 19, 2021, the [Department] spoke to Ms. Keirsten Wiggins, who previously care[d] for the children while [Mother] went to work. Ms. Wiggins reported that one night, [Mother] did not pick her children up and would not answer her phone.

> Ms. Wiggins stated that she planned to allow Aubria to sleep in the room with her 4 year old daughter while Gabrien was going to sleep on the couch. As she was getting the children ready for bed, she found her daughter with her pants down. Ms. [Wiggins] stated that she then separated the children and her daughter disclosed that Aubria had pulled her pants down and touched her private area.

> On May 28, 2021, the [Department] spoke to [Father's wife] who stated that [Father] only sees the children when [Mother] randomly drops them off at their home or calls them to get the children. [Father's wife] stated that they never know how long they will have the children and that it might be a few hours or a few weeks.

> On June 7, 2021, the [Department] completed a home visit with [Mother] and an unknown male. [Mother] stated that she met the man online, but she did not know his name. The unknown male was observed playing with the children and when asked he stated his name was "Dom" from North Carolina.

---

are not at issue in this appeal. Regarding this point, we observe that counsel for Father filed the following with this Court during the pendency of the appeal:

> [Father] did not file an Appeal . . . and does not intend to participate in the Appeal.

> Attached please find Appellee's Verification dated March 6, 2023, which declares that he did not want to file an Appeal of the decision of the judge and accepts the decision of the judge. See attachment A, attached, and incorporated herein.

Aubria later stated that she was told to call the man "King".

[Mother] reported that she has been homeless for several years until her mother found a trailer to rent. [Mother] further reported that she often travels to see friends and family, but often runs out of gas and has to stay in her car until someone can bring her gasoline.

[Mother] stated that Aubria and Gabrien are not enrolled in school and that she does not have their birth certificates.

On June 7, 2021, the [Department] spoke to Aubria who disclosed that when she stays with her father all of the children stay in one bedroom, and her brother . . . put his hand in her pants and touches her privates. She stated that she will go to the couch so he will leave her alone, but hasn't told anyone because she was scared.

Aubria reported that the weekend prior they ran out of gas [and] . . . had to stay in the car until someone could bring them more gas. She said that her mother often runs out of gas and they will sleep in their car.

Aubria stated that she and her brother have had many babysitters, but most often they stay with their grandfather[.] . . . [The grandfather] was found to be a registered sex offender.

The [Department] was unable to speak with [Father] due to his work schedule or not having cell phone service. However, [Father] left a message for the [Department] to speak to his wife.

(paragraph lettering in original omitted). The Children were later adjudicated dependent and neglected in an order entered by the trial court on September 21, 2021.

Following the Children's removal, a number of permanency plans were created and ratified. The first of these plans, which was created towards the end of June 2021, recited that "[Mother] is currently incarcerated with pending charges of domestic assault, criminal impersonation, and out of county warrants, and she has an extensive history of engaging in criminal activity and multiple arrests." The plan additionally noted as follows: "[Mother] has a history of mental health issues and substance use. [Mother] last used drugs about a month ago. [Mother] has other children with whom she does not have custody and multiple prior CPS cases." In order to address these concerns, along with other issues such as Mother's residential instability and her history of leaving the Children in unsafe situations, the permanency plan included the following responsibilities for Mother: (1) to abide by all laws upon her release to ensure she is not arrested again, (2) to abide by all rules/regulations of her probation/parole, (3) to sign a release of information "so FSW can communicate

- 3 -

with her probation officer," (4) to complete a mental health intake, (4) to complete an alcohol and drug assessment and follow all recommendations, (5) to sign a release of information "so FSW can communicate with all providers to help monitor her progress," (6) to submit to regular and random drug screens and be negative for all substances, (7) to complete domestic violence education and follow all recommendations, (8) to complete parenting education and follow all recommendations, (9) to demonstrate appropriate parenting skills during the supervised visitations, (10) to maintain housing for a minimum of four months, (11) to obtain stable housing within sixty days of her release from jail and provide proof of housing to the Department "which will include a lease/rental agreement with her name on it" and allow a walk through, (12) to "provide FSW with any change in her contact information within 24 hours of the change," (13) to provide proof of stable and legal income within thirty days of her release from jail, (14) to engage in appropriate communication with the Children during visitations, (15) to confirm visitation twenty-four hours in advance, and (16) to provide for the Children's basic needs during twice-monthly visits and to arrive on time. Mother's responsibilities remained substantially similar under subsequent plans that were created, although as the Department has highlighted on appeal, once Mother completed an alcohol and drug assessment, the permanency plans were modified to specifically reflect the recommendations of that assessment. Indeed, in the second permanency plan, for instance, the plan noted that Mother had been recommended drug treatment in an intensive outpatient program if she failed a hair follicle drug test. Mother, the plan noted, "failed the hair follicle drug test on 10/25/21 for cocaine, so she needs to complete IOP drug treatment."

Nearly a year following the Children's removal, and with significant concerns surrounding Mother still in existence, the Department filed a petition to terminate her parental rights. As grounds for the requested termination of her parental rights, the Department averred the following: abandonment by an incarcerated parent for wanton disregard, abandonment for failure to provide a suitable home, substantial noncompliance with permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the Children. At the ensuing trial, which took place in January 2023, the Department adduced a wealth of proof pointing to, among other things, continued drug use and legal troubles by Mother post-removal, Mother's failure to maintain a stable residence, and Mother's inconsistency in visiting the Children.

*Overview of Testimony from Key Witnesses at Trial*

At the time of trial, Mother testified she had been residing in Kentucky for a month and that prior to that, for about three months, she had resided in McEwen, Tennessee. Before her residence in McEwen, Tennessee, Mother testified that she had lived in New Johnsonville, Tennessee for "[m]aybe . . . about a year and six months." When counsel for the Department followed up by asking if Mother had ever reported addresses in Franklin or Clarksville, Mother responded that she had, in fact, stayed in Clarksville "for a little bit"

with a friend. According to Mother, she had stayed there the year prior "after I got incarcerated, and I got out."

When discussing the removal of the Children, which Mother noted had occurred while she and the Children were living in New Johnsonville, Mother testified as follows:

They said that they removed them because Aubria had never been in school and that was a concern. So they had, I guess, to get her in school and stuff like that and give me time to get on my feet, 'cause I had just gotten a residence. I had been homeless for, like, two years before that, so[.]

The transcript reflects that Mother nodded her head affirmatively when she was asked if the Children had been with her during the two years she stated she was homeless. When Mother was asked why she was homeless, she stated that she "wasn't working at the time," and when she was asked why she was not working, she responded as follows: "I just wasn't working. . . . I got depressed. I was just going through a lot at that time." In further discussing her difficulties in keeping a job and caring for the Children and other children of hers, Mother stated as follows: "[I]t was hard for me to keep a job because I have four kids and I didn't have a babysitter, really, and nobody to help me watch them. And I didn't have -- I wasn't making enough money for childcare expenses for four children."

Much of Mother's testimony revealed her failure to complete responsibilities required of her under the permanency plans that were created. For instance, whereas Mother testified that she recalled participating in parenting classes, she also testified that she had not completed them. Moreover, whereas Mother acknowledged that an intensive outpatient program was one of the recommendations from her alcohol and drug assessment and testified that she "started the IOP," she subsequently admitted that she did not successfully complete the intensive outpatient program she had started. When asked if she had been discharged because of missing sessions, Mother stated, "Yes." Mother testified, "[S]ometimes I would have, like, parenting classes that day, or I would oversleep, and it was just stuff like that." Mother testified that she understood that completing an intensive outpatient treatment program had been a permanency plan requirement, and she acknowledged that she had never done so. Regarding the required intensive outpatient treatment program, Mother testified that she would "like a chance to restart it now." According to some of her initial testimony, the Department had not done anything to help her regarding outpatient treatment. Later, however, Mother acknowledged that someone from the Department had emailed her a list of places, stating as follows: " I forgot about that. Yes, she did do that."

Although Mother testified that she did a mental health assessment when she had participated in the intensive outpatient program, she testified that she did not have records reflecting that she did so. Regarding the subject of visitation, Mother testified that she had visited regularly with the Children, but she also acknowledged she had missed some visits.

According to Mother, she "might have missed, maybe, five or six in the past year and change." When later asked if there was a reason why she had missed visits, Mother responded that she "got incarcerated and then . . . either . . . didn't have a ride, or . . . couldn't get there."

Mother acknowledged she had been incarcerated several times since the Children's births, and her testimony revealed that several legal issues had manifested during this custodial episode. For instance, in addition to testifying about a recent driving offense that she had missed a court date on, Mother testified about another unresolved charge from the summer of 2022 that she stated was for "[d]riving on a suspended, driving on revoked, unlawful drug paraphernalia, and possession with intent." Mother testified that family or the Children's father would take care of the Children whenever she was arrested.

As of the time of trial, Mother testified that she was not participating in any services, stating, "I've just been working and I got my new place and stuff, so I'm just focusing on that." Mother stated that she had a hair follicle drug screen scheduled for the day after trial, but she also acknowledged that the screen had been requested of her the prior October. Although Mother acknowledged that drug screens from October 2021 and May 2022 had tested positive for cocaine, she stated that the last time she had used cocaine was "[m]aybe . . . a year ago." She also further testified, however, that her drug possession charge from the prior summer was in relation to crack cocaine.

Mother testified that she had started a full-time job a couple of days before the trial, although when her attorney asked her if she had consistently been employed since the Children came into custody, she candidly responded, "On and off." Mother was not sure how much child support she had paid since the Children came into the Department's custody, but she stated that she had tried to buy school clothes, stating as follows on the subject: "Yeah, I buy them clothes. I bought them shoes last visit. I try to get them the stuff they need and bring it when I go to visits."

Mother testified that she loved her children and that "they mean everything to me." When asked if it was her testimony that she had made some progress but just needed "more time to continue," Mother responded, "Yes." According to Mother, her mother had just retired and would be able to be a support system for her. Mother also acknowledged that she previously "wasn't being responsible" and that it was her fault that the termination proceeding was taking place.

Another witness at trial was Heather Hotrum, an employee with Camelot who had been assigned to provide parenting education services to Mother. Parenting education services were offered once per week, but according to Ms. Hotrum, Mother did not complete the services provided and was inconsistent in attending. Elaborating on this, Ms. Hotrum testified as follows:

I did one session October [2021], one in November, none December. It [sic] was reached out every week of January and February and communicated a lot with the DCS FSW. At that point, then we scheduled an in-person visit in March and there was just a lot of non-call/no-shows, and she didn't show to that one either, and we pulled the right to the home.

Ms. Hotrum's testimony reflected that Mother had done initial intake with Camelot in September 2021.

Another noteworthy witness from the trial was Krista Vermilye. Ms. Vermilye, who was a family service worker with the Department, testified that she had been the caseworker for the Children since May 2022. Another person, Shauna Lowery, had been the Children's previous caseworker.

According to Ms. Vermilye, the Children had been removed amidst allegations of educational neglect and lack of supervision. When asked what services were offered by the Department in the beginning following the Children's removal, Ms. Vermilye testified that the Department offered "an A&D assessment, as well as domestic-violence intervention . . . , as well as parenting education." The alcohol and drug assessment, which was paid for by the Department, was completed in August 2021, and Ms. Vermilye's testimony reflected that the Department had referred Mother for parenting education and domestic violence intervention within a couple of weeks of getting the case. According to Ms. Vermilye, the Department had also offered drug screens during that period of time.

In Ms. Vermilye's view, Mother had completed an alcohol and drug assessment but not any of the other tasks. Although she noted that Mother had started several intensive outpatient programs, she testified that Mother did not complete them. Ms. Vermilye further testified that she was not aware of Mother having completed a mental health intake and that, "[i]f she did complete it, she didn't provide the provider information . . . to obtain those records." Whereas Ms. Vermilye also testified that Mother had completed approximately seven to nine drug screens "throughout the period of the case,"[3] she stated that Mother had several hair follicle drug screens to complete in the beginning of the custodial episode but that Mother "did not complete those in the allotted time." She further testified that Mother did not follow through when drug screens were requested and had given excuses. Although Mother had, according to Ms. Vermilye's testimony, passed a drug screen within the two months prior to trial, drug concerns were still a significant issue in the case, as were questions of Mother's work and residential stability. In addition to discussing Mother's failure to complete an intensive outpatient program, Ms. Vermilye testified that there was routinely not proof of employment for Mother. Further, according to Ms. Vermilye, in addition to the residences Mother had testified about at trial, Mother

---

[3] At another place in her testimony, she stated that Mother had *passed* approximately five drug screens.

had reported "[m]any" other places to her and the Department during this custodial episode. When discussing how many addresses Mother had provided, she stated, "To myself alone, it would be approximately 6. From the beginning, at least 13." Ms. Vermilye testified that many of the addresses Mother had reported were "with friends who do not allow DCS to come to that home," and thus the Department had been unable to complete a home visit at several of those addresses. Ms. Vermilye testified that Mother's residence at the time of trial was in Kentucky but noted that the Department had only been informed of Mother's move to Kentucky the month before trial. Ms. Vermilye's testimony reflected that, in her view, a suitable home was more than just the four walls of a structure and that the pertinent inquiry also involves looking to circumstances of the family, including consideration of the presence of any criminal charges.

As for the latter concern of criminal charges, Ms. Vermilye's testimony reflected that Mother had been subject to a flurry of arrests and charges in the wake of the Children's removal, including charges related to drugs. For instance, she testified that Mother was arrested about nine days after the Children were removed. Although Mother later bonded out, Ms. Vermilye testified that Mother was subsequently arrested for driving with a suspended license in May 2022. Although she bonded out once more a few days after this latest arrest, she was then arrested again the same month for driving without a license. Ms. Vermilye testified that Mother "also had possession of THC." She further discussed how Mother was arrested again in July 2022 "for driving on a suspended [license] and possession of cocaine."

As for Mother's visitation with the Children, Ms. Vermilye testified that Mother was not consistent. In specifically testifying about the matter, she explained as follows:

> It would go from being sick, to not having a ride, to not being able to make the time because something had come up. Or she would be en route to the visit and something would happen to the vehicle; flat tire, ran out of gas. It was just different reasonings that she would provide to Camelot.

As is evident from the testimony of another witness, *see infra*, Mother's failure to show up to visits was not without its consequences on the Children. Ms. Vermilye testified that a former caseworker had transported Mother to visits in the beginning, and although Mother was provided transportation from her own mother later on, the Department also provided gas cards.

Ms. Vermilye testified that the Children had a bond with Mother. When subsequently asked, however, if she had ever been able to observe the Children with Mother, she replied, "I have not." Further, although she relayed that Mother had a bond, she also remarked, "It's been observed to be a friendship bond, not a mother bond." In addition, although Ms. Vermilye testified that the Children "talk about their visits with their mom" and "state that they love their mom," she testified that the Children had not

stated that they missed their mom.

Ms. Vermilye testified that the Children are doing "[r]eally good," that their foster parent is actually a teacher in the school they attend, and that the Children "really like being able to see her and be around her." She further noted that the Children receive counseling and therapy weekly. Gabrien, she stated, was diagnosed with ADHD, is on psychotropic medication, and receives medication management. She testified that the medication has assisted him.

Although Ms. Vermilye testified that the Department had not been able to identify an adoptive home for the Children as of the time of trial, she testified that the current foster parent was "very open to it." She further testified that, "[b]ecause [the Children] are comfortable where they are at, there is not a current need for them to be moved." In further testimony about the Children's future prospects, she testified that Camelot had identified four possible adoption homes for the Children to be placed in.

Ms. Vermilye testified that Mother had not changed her circumstances so as to make her home and situation safe for the Children to go to. Indeed, when asked if Mother had "made a lasting adjustment after the services provided by the Department to where [she] could make [her] home appropriate," she responded, "No." She testified that it "would be critical" that any caregiver ensure that Aubria and Gabrien receive the counseling and other services they are provided outside of their foster home. Gabrien, she explained, can be "very violent, very aggressive." In elaborating further on the subject, she stated:

> The meds have changed several times to get him stable. He was very violent and aggressive towards foster parents and other children when he first entered custody.
>
> And then he also has an IEP, so he's slower cognitively. A little bit of a speech delay, as well, so he struggles to communicate and that's where a lot of his frustration has come from.
>
> The meds have really balanced him out, and he is stable when he talks. He doesn't get upset when people don't understand. He will just keep saying the word and he wants you to get it.
>
> He has changed drastically since being on the correct medication and having the mental health, as well.

According to Ms. Vermilye, Gabrien was bonded with his sister, and when discussing Aubria's needs and progress since removal, she testified as follows:

> When she first came into custody, she had not been in school ever so

- 9 -

that was a really big struggle. She was not caught up on education whatsoever. You would not know that now.

She loves math. She wants to be a math teacher or do something with math because she loves math so much.

She's very smart. She reads. She writes. You would not even know that the child had not ever been in school[.]

Ms. Vermilye testified that Mother did not contact her to ask about the Children on a regular basis and claimed that Mother had not demonstrated herself to be proactive in addressing her issues. Among other things, she testified to having had communication issues with Mother, as evidenced by the following trial excerpt:

She also has had several different phones changed, so I don't know if she did receive some of those messages because I didn't have a current number.

. . . .

So if I didn't get a response, I assumed it was disconnected. I'd call and it was, so not having the communication and being able to get ahold of her has also been the biggest struggle.

Ms. Vermilye agreed that it was imperative that the Children get permanency and stability, and she testified that she was recommending that Mother's parental rights be terminated. She testified that the Children were in a stable environment at the time of trial and were thriving. She further testified that she believed it would be detrimental to the Children to return them to Mother and that it was in the best interests of the Children for Mother's rights to be terminated.

Avery Wesson, a care coordinator with Camelot, testified that he had been associated with the Children's case since March 2022. He testified that he had kept tabs on the Children to see how they were doing in their foster placement and sometimes facilitated visits between the Children and Mother. He testified that he had worked with Mother's schedule to facilitate visits but that Mother had attended only seven out of twenty visits that she should have had. He even noted that visits had been moved to Saturdays when Mother started to work. During one of the visits that occurred, Mr. Wesson observed Mother yelling. In recounting the incident, he testified as follows: "We were at a park, but it was louder than I would expect someone to be yelling at a park, if that makes sense." According to Mr. Wesson, Mother "act[ed] more as a friend with occasional lapses into the fact that she was a parent." Whereas Mother's general schedule was to have two visits a month, Mr. Wesson agreed that the most she ever had was one.

- 10 -

When testifying about times when the Children were present and ready for a visit but Mother did not show up, he remarked that the Children were "very upset with it" at first. According to him, "[t]hey became a little defiant and obstinate." When further elaborating on this issue of Mother's failure to show up to visits, he recounted as follows:

And then after a while, Aubria kind of became jaded with it and was, like, She's not gonna show up. I just know it.

And then Gabrien wouldn't really say anything, but he would show it physically, like, you know, pushing.

There was one point where [Mother] didn't show up to a visit and Gabrien was so upset about it that he hit Aubria hard enough to kind of knock her into the door of the car, and that was a fun thing to deal with.

At one point, Mr. Wesson recounted, he stopped informing the Children of when visits were scheduled. His testimony indicated that this was done in an attempt to shield the Children in case Mother did not show up.

He testified that he thought the Children loved Mother. When asked if he thought Mother loved the Children, he replied, "To some degree, yeah." When asked if he thought Mother and Children have a relationship or a bond, he responded, "Yeah." He further testified that the visits that occurred typically went well, with the exception of the visit where Mother was yelling. It was after that visit that he "kind of started noticing that [Mother] would kind of be more of a friend with occasional lapses in the fact that she's a parent."

Towards the conclusion of the trial, the trial court heard testimony from the Children's stepmother, the Children's paternal grandmother, and the Children's maternal grandmother. Testimony from the maternal grandmother reflected that she had generally retired from working, and she stated that she could help out with the Children. In offering to help out with the Children, she testified that she could possibly move to be with Mother. Of note, her testimony also alluded to the fact that Mother herself still had more work to do to better herself as a caregiver. Indeed, when discussing the prospect of possibly moving in with Mother, the maternal grandmother testified as follows: "I can move anywhere, yeah, **until she can get herself real good and straight**. I think I could help with that."[4] (emphasis added).

---

[4] That Mother had unresolved issues was also essentially conceded by her counsel during closing argument at trial, with counsel referring to Mother's progress as "ongoing."

*Trial Court's Termination Order*

Upon the conclusion of trial, the trial court orally ruled that Mother's parental rights should be terminated, and this ruling was subsequently memorialized in a written order entered on February 8, 2023. As reflected in the written order terminating Mother's parental rights, the trial court determined that all grounds for termination alleged against Mother had been proven and that the termination of her parental rights was in the Children's best interests. As part of its best interests inquiry, the trial court noted, among other things, that Mother had not demonstrated a sense of urgency to address the issues necessitating foster care, that she had pending legal charges and was subject to incarceration, and that she had not demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe for the Children to be in her home. This appeal followed the trial court's termination of Mother's parental rights.

**STANDARD OF REVIEW**

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. The petitioning party must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, the petitioning party must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

- 12 -

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

Although Mother requests that this Court reverse the trial court's termination of her parental rights, the Department maintains that the judgment of the trial court should be affirmed. In assessing the propriety of the trial court's judgment, we turn first to the grounds it relied upon in terminating Mother's rights.

### *Grounds for Termination*

*Abandonment by an Incarcerated Parent for Wanton Disregard and Abandonment for Failure to Provide a Suitable Home*

Tennessee Code Annotated section 36-1-113(g)(1) provides for termination when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Two of the grounds relied upon by the trial court here, i.e., abandonment by an incarcerated parent for wanton disregard and abandonment for failure to provide a suitable home, are among the incorporated definitions of abandonment. As discussed below, we are of the opinion that the trial court's judgment should be vacated as to both of these grounds.

The ground concerning "wanton disregard," which implicates a test for abandonment applicable to incarcerated or recently incarcerated parents, is established when:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> . . . .
>
> (*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[5]  As this Court has previously explained:

> "Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). But the actions constituting wanton disregard must have occurred at a point in time when the parent had knowledge of the child's existence, which can include "a child *in utero*." *In re Anthony R.*, 2015 WL 3611244, at *3.

*In re Tinsley L.*, No. E2022-00965-COA-R3-PT, 2023 WL 6057476, at *2 (Tenn. Ct. App. Sept. 18, 2023).

Although the record supports a finding that Mother was incarcerated during part of the four months immediately preceding the filing of the action, it appears that the trial court did not apply the governing statutory standard applicable at the time of the filing of the termination petition.  Indeed, although the inquiry under the operative version of the statute here is whether the parent "[h]as engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child," the trial court specifically found—without reference to any temporal marker end date—that Mother "engaged in conduct that exhibits a wanton disregard for the children's welfare by engaging in criminal behavior [the Children's] entire lives" and then specifically cited to, among other things, behavior of Mother's that occurred *after* the incarceration incident that triggers review here.  For instance, the trial court notably referred to "drug charges that [Mother] obtained approximately six months ago that have not been resolved."  Such charges, as we understand the record, refer to charges Mother obtained after the filing of the termination petition itself.  Although the *current* version of the statute does look to whether the parent "engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child," the operative statute here, again, looks to the period "prior to incarceration."  Inasmuch as the trial court did not cabin its wanton disregard analysis to the pre-incarceration period dictated by the controlling statutory language, we determine that its conclusion under this ground should be vacated.  However, given our ultimate determination herein that the termination of Mother's parental rights can be upheld on other grounds, *see infra*, we need not remand the matter for further findings on this ground under

---

[5] This is the version of the statute in effect at the time of the filing of the termination petition in this case.

the governing statutory standard. *See In re K.W.*, No. M2021-00408-COA-R3-PT, 2021 WL 5783355, at *10 n.5 (Tenn. Ct. App. Dec. 7, 2021) ("We do not remand the matter for further findings pursuant to the proper standard, however, in light of the rest of our disposition herein, which results in an affirmance of the termination of Father's parental rights.").

In connection with our discussion on this matter, we note that the need for adequate and careful findings is particularly significant when the termination of a parent's rights, as well as the interests of children, are at stake. Indeed, this Court has previously noted as follows concerning the necessity for specific findings in termination cases:

> [P]ursuant to Tennessee Code Annotated section 36-1-113(k), the trial court's order must contain "specific findings of fact and conclusions of law." *See* Tenn. Code Ann. § 36-1-113(k). The requirement for specific findings in termination orders is a highly significant one and "reflects the Tennessee General Assembly's recognition of the necessity of individualized decisions in these cases." *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at *3 (Tenn. Ct. App. Nov. 13, 2003). Moreover, it "reflects the legislature's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals." *Id.* "Meticulous compliance" with the mandates of Tennessee Code Annotated section 36-1-113(k) is required, *In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244, at *3 (Tenn. Ct. App. Apr. 25, 2012), and "[w]hen a trial court fails to enter an order containing adequate findings of fact and conclusions of law with regard to all alleged grounds for termination, the Tennessee Supreme Court has instructed the appellate courts to remand the case to the trial court for the preparation of appropriate written findings of fact and conclusions of law." *In re C.R.B.*, 2003 WL 22680911, at *4. We have previously urged judges and litigants to be thorough in the preparation of orders, particularly when the rights of parents and minor children are involved. *In re Jaylah W.*, 486 S.W.3d 537, 554 n.18 (Tenn. Ct. App. 2015).

*In re Jayden L.*, No. E2020-01668-COA-R3-PT, 2021 WL 2255496, at *2 (Tenn. Ct. App. June 3, 2021).

The need for further and clear findings would not only be needed relative to the "wanton disregard" ground in our view; respectfully, we are of the opinion that the trial court's findings pertaining to abandonment for failure to provide a suitable home are also lacking. As codified at the time of the filing of the termination petition in this matter, this other ground of abandonment provides for termination when:

> (ii)(*a*) The child has been removed from the home or the physical or legal

custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). In our view, clear and adequate findings from the trial court are specifically lacking here concerning subsection (c). First, as a technical matter, the trial court's order does not contain a finding that Mother failed to make reciprocal reasonable efforts to provide a suitable home for a period of four months following removal. That is, although the order does make a finding concerning Mother's efforts, the specific finding included on the matter—which itself appears to somewhat blurredly attempt to merge the efforts inquiry with the "demonstrated a lack of concern" inquiry under the statute—does not articulate that Mother's failure to make reasonable efforts spanned a period of four months. Indeed, in pertinent part, the order simply recites that "[Mother] failed to make any reasonable efforts to provide a suitable home for the children at an early date."[6] This lack of direct specificity concerning a period of four months notwithstanding, we note that, in the paragraph prior to this finding, the trial court noted that the relevant time period for this ground for termination was "June 9, 2021 to October 9, 2021," a period which corresponds to the four months after the Children's

_____

[6] There does not appear to be a specific separate finding that the parent here, Mother, "demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

- 16 -

removal on June 8, 2021. A less narrow reading of the order might therefore construe the court's finding about Mother's failure to make reasonable efforts as a finding that she failed to do so over the previously referenced June 9, 2021, to October 9, 2021, period. However, an additional issue still exists with the order even when read through this contextual lens. Namely, although it does appear from the nominal framing in the trial court's order that the court intended to focus on the four months after the Children's removal, its specific engagement with Mother's efforts does not appear to be so limited, thus ultimately making the specific temporal scope of the court's finding, or intended finding, somewhat unclear as it pertains to the "reciprocal reasonable efforts" assessment. For instance, the trial court's order prominently refers to Mother's discharge from intensive outpatient drug treatment when appearing to discuss her efforts.[7] This implicates facts outside of the four-month period that the trial court purported to focus on regarding efforts made to provide a suitable home.[8]

In short, there is a lack of specificity in the trial court's findings regarding some of the elements connected to this ground and a lack of clarity as to which four-month period the trial court was actually intending to assess.[9] As a result, and as a point of instruction as to the importance of having specific and adequate findings,[10] we therefore vacate this ground for termination. As with the other abandonment ground, however, we do not actually remand the matter for further findings. *See In re K.W.*, 2021 WL 5783355, at *10 n.5 ("We do not remand the matter for further findings pursuant to the proper standard, however, in light of the rest of our disposition herein, which results in an affirmance of the termination of Father's parental rights.").

---

[7] The Department's brief also references the subject of "IOPs" as supposedly being associated with the "relevant time frame" of "June 9, 2021, to October 9, 2021."

[8] As mentioned earlier in this Opinion, the second permanency plan noted that Mother had been recommended drug treatment in an intensive outpatient program if she failed a hair follicle drug test. Mother, the plan noted, "failed the hair follicle drug test on 10/25/21 for cocaine, so she needs to complete IOP drug treatment."

[9] To be sure, as we have noted before, "[t]he statutory four-month period during which DCS must make reasonable efforts and the parent reciprocate them is not limited to the four months immediately following removal." *In re Robert H.*, No. E2022-00809-COA-R3-PT, 2023 WL 3451534, at *4 (Tenn. Ct. App. May 15, 2023). As an aside, we also note that we do not intend to suggest that evidence outside of a four-month period relied upon to establish this ground is itself otherwise irrelevant to this ground for termination. If, for instance, the four months after removal are used to specifically assess a parent's "reciprocal reasonable efforts," this does not mean later conduct is not pertinent in consideration of this ground. Indeed, as it concerns the "demonstrated a lack of concern" inquiry, there is case law explaining that a parent's more recent behavior may be considered. *See In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *9 (Tenn. Ct. App. Sept. 27, 2017).

[10] We express no opinion as to the ultimate merits of this ground for termination given our decision to vacate in light of the written findings presented.

- 17 -

*Substantial Noncompliance with Permanency Plan*

We next review the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(2), which provides that a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Here, the trial court found that the responsibilities set forth in the permanency plans were reasonably related to remedying conditions necessitating foster care, and in pertinent part, it found as follows concerning several key responsibilities in this case: (1) that, although Mother had completed an alcohol and drug assessment, she had failed to follow the recommendations and had failed to complete an intensive outpatient drug treatment program; (2) that, although Mother had passed some drug screens, she had also failed some and made excuses why she could not submit to others; (3) that Mother had never completed parenting services and had been discharged due to noncompliance; (4) that Mother was not consistent in visiting with the Children; (5) that Mother had not maintained a stable home and had provided the Department with approximately thirteen addresses; and (6) that Mother had continued to incur criminal charges.

In light of the above findings and our review of the record, we agree with the trial court's conclusion that there was clear and convincing that Mother was in substantial noncompliance with the statement of responsibilities in the permanency plans. Whereas Mother makes a passing argument on appeal that the Department "did not provide enough reasonable efforts to assist her towards the Permanency Plan," this allegation is not relevant to establishing this ground under Tennessee Code Annotated section 36-1-113(g)(2). *See In re Ziquavious P.*, No. W2022-00743-COA-R3-PT, 2023 WL 3369188, at *3 (Tenn. Ct. App. May 11, 2023) ("[R]easonable efforts are only relevant to two inquires: the ground of abandonment by failure to establish a suitable home and the best interest analysis.").

*Persistent Conditions*

Another ground for termination that the trial court held was established is codified at Tennessee Code Annotated section 36-1-113(g)(3). Commonly known as "persistent conditions" or "persistence of conditions," this ground applies when

> [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).[11] "Each of the statutory elements that make up the ground known as persistence of conditions must be established by clear and convincing evidence." *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *8 (Tenn. Ct. App. Aug. 4, 2014) (citing *In re Valentine*, 79 S.W.3d at 550).

We agree with the trial court's conclusion that this ground was supported by clear and convincing evidence. The proof shows that the Children were removed from Mother in the summer of 2021 following the filing of a petition to declare the Children dependent and neglected. Clearly, at the time of the January 2023 trial, more than six months had elapsed. There also clearly were conditions that prevented the Children's safe return. Among the other concerns detailed herein that pertain to Mother's failure to complete various services to improve her situation, Mother prominently had not effectively addressed concerns about substance abuse, as she failed to ever complete intensive outpatient treatment. Moreover, the record clearly supports the conclusion that there was little likelihood that conditions preventing the Children's return to Mother would be remedied at an early date. The prolonged track record over the course of the custodial episode generally pointed to Mother's lack of being proactive, and Mother herself testified that she was not participating in any services at the time of trial. There is also sufficient

---

[11] This is the version of the statute in effect at the time of the filing of the termination petition in this case.

evidence in this record to support the conclusion that a continuation of the parent and child relationships Mother had with the Children would greatly diminish the Children's chances of early integration into a safe, stable, and permanent home. There is no indication that Mother's situation will improve by an early date, and in contrast to concerns that exist as to her general stability and ability to care for the Children, the Children are reportedly thriving in foster care and, as accurately noted by the Department, in a potentially adoptive foster home.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Children*

Finally, we turn our review to the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires the Department to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first prove that the parent "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department must prove that placing the Children in the parent's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first of the aforementioned prongs, the Tennessee Supreme Court has clarified that the statute "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.*

In explaining why this ground had been satisfied as to Mother by clear and convincing evidence, the trial court noted that Mother "had 19 months to address her substance abuse issues and establish a safe and stable home for the children, but . . has not done so." The court also noted that, in addition to not addressing substance abuse issues,

Mother had not completed parenting education and had pending charges she incurred after the Children were removed. Continuing on, the trial court noted that Mother had made excuses for missing visits and drug screens and that her actions demonstrated a lack of willingness and ability to care for the Children. Further, the trial court found that returning the Children to Mother's custody would pose a risk of substantial harm to them, that the Children were thriving in their foster home placement where they were provided with a stable life, and that, while the Children needed stability in their lives, Mother had failed to provide such with her unstable housing and employment and arrests.

We agree with the trial court that this ground for termination was established by clear and convincing evidence. Mother may have professed her love for the Children at trial, but the inquiry into a parent's willingness involves looking into more than a parent's verbal expressions. *See In re Eli H.*, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at *10 (Tenn. Ct. App. May 8, 2020) (noting that a "parent's actions can demonstrate a lack of willingness"). Here, Mother's actions throughout the custodial episode do not evidence active efforts to establish stability for the Children. Indeed, not only did Mother continue to incur legal charges and fail to complete intensive outpatient treatment, she also failed to complete parenting education. Moreover, as for any efforts to maintain contact with the Children, the proof showed that Mother was not consistent with visitation.

As we mentioned earlier in this Opinion, Ms. Vermilye testified that Mother had not demonstrated herself to be proactive in addressing her issues, and this assessment is certainly an apt one based on the proof. Further, though, Mother's failure to substantively address issues of concern in the case itself accompanied a continued lifestyle that reflects an inability to care for the Children, and we agree with the trial court that the record supports the conclusion that placing the Children with Mother would pose a risk of substantial harm to them. In this vein, we of course also agree with Ms. Vermilye's testimony that it would be detrimental to the Children to return them to Mother, particularly so in light of Mother's failure to concretely address her substance abuse issues and given her frequent encounters with the law. As the Department has argued on appeal as it concerns the substantial harm prong of this ground, substantial harm can be supported through evidence of a parent's repeated criminal conduct and history of substance abuse. *See In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019); *In re Piper B.*, No. M2017-00930-COA-R3-PT, 2018 WL 3954328, at *10 (Tenn. Ct. App. Aug. 17, 2018). Given that we discern no error in the trial court's determination that this ground was properly established, and further, given that at least one ground for termination has been sufficiently established in this case, we can now shift our attention to the issue of whether the termination of Mother's rights was in the Children's best interests.

### Best Interests Inquiry

When at least one ground for termination has been properly established against a

parent, as it has in this case, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Tennessee Code Annotated section 36-1-113(i), which lists factors to be considered as part of the best interests inquiry, states that the trial court "shall consider all relevant and child-centered factors applicable to the particular case before the court." Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of statutory factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

Here, as part of its consideration of the Children's best interests under section 36-1-113(i), and in support of its ultimate conclusion that, by clear and convincing evidence, the termination of Mother's parental rights was in their best interests, the trial court noted in relevant part that the Children had "a critical need for stability and continuity of placement," that the Children were thriving in their foster home, that Gabrien has ADHD and speech issues that were being addressed in the foster home, that the Children have a positive relationship with the foster parent who is considering adoption, and that it would be detrimental for the Children to have a change in caretakers and physical environment. Further, the court found that Mother had not demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe for the Children to be in her home; that Mother had pending legal charges and was subject to incarceration; that Mother had nineteen months to address her substance abuse issues, participate in parenting, resolve her legal issues, and establish a stable home but failed to do so; that Mother provided multiple addresses to the Department since the Children were placed in foster care; that Mother had not demonstrated a sense of urgency to address the issues necessitating foster care; that Mother had failed to submit to drug screens and that, based on that evidence and pending unresolved drug charges, "there continues to be the use of substance abuse in the home that may render [Mother] from consistently caring for the children in a safe and stable manner"; and that Mother was not consistent in attending visitation and "often cancelled visitation or sometimes failed to show which upset the children."

The record clearly and convincingly supports the trial court's determination that the termination of Mother's parental rights was in the Children's best interests. As the trial court referenced, the proof clearly points to stability in the Children's placement, while also overwhelmingly demonstrating continued concern for Mother's ability to render any parental care. The trial court's assessment that Mother had not demonstrated a sense of urgency is clearly supported by the extensive evidence we have detailed herein, and of particular note in this case, Mother never completed intensive outpatient treatment despite the persistent concerns regarding substance abuse. Mother also, among the other varied concerns we have discussed, continued to receive legal charges. We recognize that Mother professes love for the Children, but in light of her failure to proactively address significant areas of concern over the course of this custodial episode, there is no indication when, if at all, Mother would ever be in a position to properly care for the Children. In light of that backdrop of uncertainty, the need for stability and pursuit of permanency in the Children's lives, and our consideration of the totality of the circumstances presented by the record in this case, we affirm the trial court's conclusion that termination is in the Children's best interests.

## CONCLUSION

In light of the foregoing discussion, although we vacate both grounds of abandonment relied upon by the trial court for the termination of Mother's parental rights, we affirm the trial court's reliance on the remaining grounds for termination and its best interests determination. The trial court's termination of Mother's parental rights is accordingly affirmed.


s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE